## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **ROBIN VOS,** | |
| Plaintiff, | Civil Action No._____ |
| v. | |
| **UNITED STATES HOUSE OF REPRESENTATIVES SELECT COMMITTEE TO INVESTIGATE THE JANUARY 6TH ATTACK ON THE UNITED STATES CAPITOL** Longworth House Office Building Washington, D.C. 20515 | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF & MOTION FOR TEMPORARY RESTRAINING ORDER** |
| **BENNIE G. THOMPSON, in his official capacity as Chairman of the House Select Committee to Investigate the January 6th Attack on the United States Capitol,** Long Worth House Office Building Washington, D.C. 20515 | |
| Defendants. | |

PLAINTIFF Speaker of the Wisconsin Assembly Robin Vos (Speaker Vos), by and through his counsel, Graves Garrett LLC, Cramer, Multhauf & Hammes, LLP, and Lawfair LLC, for his Complaint against Defendants United States House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee") and Bennie G. Thompson, in his official capacity as Chairman of the House Select Committee to Investigate the January 6th Attack on the United States Capitol (Chairman Thompson), states and alleges as follows:

1.     This is an action to protect the Plaintiff from a Congressional subpoena (the "Subpoena") that imposes an undue burden, seeks to infringe on Speaker Vos'

legislative immunity from civil process, lacks a lawful purpose, and was issued from an unlawful Committee. Speaker Vos is the elected representative for Wisconsin's 63rd Assembly District and has served as the Speaker of Wisconsin's General Assembly since 2013. The Committee has been conducting an investigation into the events and causes of the breach of Capitol on January 6, 2021, for over 14 months. Through this investigation the Committee claims to have interviewed over 1,000 individuals, gathered untold amounts of documents, held many public hearings, and examined areas of inquiry ranging from the Ellipse Rally to legal theories and even political advocacy by private citizens. Despite conducting such an extensive inquiry, and despite having known for months about the single matter for which it seeks Speaker Vos' testimony, the Committee has served the Speaker on the afternoon of Saturday, September 24, 2022, with a subpoena to appear for a deposition first thing on the morning of September 26, 2022. This is less than 48 hours' notice, and the only intervening day was a Sunday.

2.      The only explanation for such an extreme timeline is the Committee's desire to conduct the deposition before its next publicly televised hearing on Wednesday, September 28, 2022, so that clips can be edited out to be used in a multimedia show. Importantly, the Committee is not seeking to depose Speak Vos to question him about the breach of the Capitol, the events leading up to January 6, 2021, or the events of the 2020 election. Rather, the Committee is seeking to depose Speaker Vos, with no notice, to ask him about a conversation he had with former President Donald Trump two months ago. In short, the Committee is demanding

Speaker Vos appear for a deposition to answer questions irrelevant to the Committee's investigation, with virtually no notice, in the closing days of his reelection campaign, merely because of the Committee's public relations scheme.

3. This subpoena imposes an undue burden; violates Speaker Vos' legislative immunity from civil process; falls outside of the matters the Committee was authorized to investigate; and was not issued by a validly constituted committee. Speaker Vos seeks a temporary restraining order (TRO) preventing Defendants from enforcing the Subpoena while this matter is pending and judgment declaring that the subpoena is invalid and permanently enjoining the Committee from enforcing it.

**THE PARTIES**

4. Plaintiff Speaker Robin Vos is a resident of Rochester, Wisconsin. On the afternoon of Saturday, September 24, 2022, he was personally served with a subpoena (the "Subpoena") from Defendant ordering him to appear for a deposition first thing Monday morning, September 26, 2022, attached hereto along with the transmittal letter as **Exhibit A**.

5. Defendant Select Committee is a committee created by H. Res. 503, which was passed by the U.S. House of Representatives on June 30, 2021.

6. Defendant Bernie G. Thompson is a Member of the U.S. House of Representatives and the Chairman of the Select Committee. The Subpoena challenged herein was issued under his authority as Chairman of the Select Committee.

**JURISDICTION AND VENUE**

7.     This case challenges the validity of a Subpoena issued by a body calling itself the Select Committee to Investigate the January 6 Attack on the United States Capitol. It raises claims regarding the burden imposed by the Subpoena, the scope of the investigative power of Congress under Article I of the United States Constitution, and the legislative immunity and privilege provided to state legislators under federal common law.

8.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, and 28 U.S.C. § 1346, because this action raises claims against the United States, as well as 28 U.S.C. § 2201-02, which provides for declaratory relief.

9.     The Court has personal jurisdiction over Defendants Select Committee and Chairman Thompson because they served Plaintiff with the Subpoena in this district, which is also Plaintiff's district of residence.

10.    For the same reasons this Court has personal jurisdiction, venue in this Court is proper under 28 U.S.C. § 1391(e)(1)(C).

**BACKGROUND ALLEGATIONS**

11.    On January 6, 2021, a group of protesters breached the Capitol grounds, entered the Capitol, and, by causing disorder, delayed the certification of the votes of the electors for the 2020 presidential election by several hours.

12.    On June 30, 2021, the House of Representatives passed H. Res. 503 (the "Resolution"), hereto attached as **Exhibit B**, establishing "the Select Committee to Investigate the January 6th Attack on the United States Capitol." The Resolution

was passed just two days after its introduction, with two Members caucusing with Republicans voting "yea."

13.     Under Section 2(a) of the Resolution, "the Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." The Resolution also required that "[t]he Speaker shall designate one Member to serve as chair of the Select Committee." H. Res. 503 § 2(b), 117th Cong. (2021).

14.     The Speaker appointed only 9 Members to the Select Committee. The Speaker did not appoint any Members after consultation with the House Minority Leader, Representative Kevin McCarthy. Rather, the Speaker appointed the only two Members who currently caucus with the Republican Party and who had voted for the Resolution. The Speaker failed to appoint any Member suggested by the House Minority Leader.

15.     The Speaker did not appoint a Ranking Member. The Select Committee does not have a Ranking Member.

16.     The Resolution identifies a total of three "purposes" of the Select Committee. They are: (1) to "investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021 domestic terrorist attack on the United States Capitol Complex … and relating to the interference with the peaceful transfer of power, including the facts and causes relating to the preparedness and response of [law enforcement and other instrumentalities of government], as well as the influencing factors that fomented such an attack…."; (2) to "examine and evaluate

evidence developed by relevant Federal, state, and local government agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack"; and (3) to "build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other [investigations] into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack."

17.     The Resolution identifies a total of three "functions" of the Select Committee. They are: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol regarding" various federal governmental operations; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary."

18.     Subsection (c) of Section 4 describes three categories of "corrective measures": "changes in law, policy, procedures, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the

security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

19. The Select Committee has established a website that reports on its proceedings and publishes statements by the Committee's Speaker-designated Members—that is, the Committee's only Members. See https://january6th.house.gov/

20. The Select Committee held its first hearing on July 27, 2021. The Select Committee has subsequently held eight additional hearings for a total of nine hearings. The Select Committee has an additional hearing scheduled for September 28, 2022.

21. On Friday, September 23, 2022, the Select Committee's Chair signed a subpoena for Plaintiff's deposition on September 26, 2022. See **Exhibit A**. A letter signed by the Select Committee Chairman, which accompanied the subpoena, claims that his testimony and documents are relevant because the Committee believes former President Trump called Speaker Vos in July of 2022 after the Wisconsin Supreme Court ruled dop-off boxes for absentee ballots outside of election offices could not be used in future elections and requested Speaker Vos take future actions. The Select Committee did not serve Plaintiff with the subpoena until the afternoon of Saturday, September 24, 2022.

22. Throughout the entirety of the Committee's investigation, Speaker Vos' connection to the 2020 Presidential Election has been well known. It has not been a secret that Speaker Vos was the Speaker of the Wisconsin Assembly during the 2020 Presidential Election; Wisconsin was a battleground state in the 2020 Presidential

Election; Wisconsin's procedures for the 2020 Presidential Election were the subject of pre- and post-election litigation; and many people had concerns about election irregularities concerning the 2020 Presidential Election in Wisconsin. All of these facts were publicly known from the minute the Committee was formed on June 30, 2021.

23.    The Committee has had over 14 months to investigate whatever components of the Wisconsin 2020 Presidential Election that it viewed as relevant to their investigation. Indeed, it has used its investigative powers to examine certain aspects of the Wisconsin 2020 Presidential Election, including by subpoenaing individuals involved in the Wisconsin 2020 Presidential Election in January of 2022.

24.    Despite having over 14 months to conduct its investigation, the Committee never contacted Speaker Vos or requested his deposition until recently. Not only does the Committee suddenly want to depose Speaker Vos, but this matter, which apparently was not important enough to warrant attention for months, is now so urgent that the Committee needed to serve Speaker Vos in the middle of a weekend for a deposition first thing on Monday morning.

25.    Additionally, the subject that purportedly is causing the Committee to act with such urgency is entirely outside of the Committee's authorized scope. The Committee does not want to depose Speaker Vos about the 2020 Presidential Election. Rather, the Committee wants to depose Speaker Vos about conversations he had with former President Trump in July of 2022, over eighteen months after January 6, 2021.

26.     Conversations between Speaker Vos and former President Trump in July of 2022 have no bearing on the events and causes of January 6, 2021. Further, these conversations were publicly reported in July, yet the Committee chose to wait for over two months to demand a deposition of Speaker Vos and now claims it cannot even afford 48-hours' notice.

27.     The Committee's actions in issuing the Subpoena to Speaker Vos demonstrate the Committee has lost all sense of boundaries. The Committee no longer believes the scope of its investigation is limited to the events of, or leading up to, January 6th. Instead, it believes it has a roving commission to inquire of any matter that piques its interest concerning former President Trump. The Committee also does not believe it must consider the rights of the individuals it subjects to its subpoenas. The Committee does not believe these individuals deserve any meaningful notice. Finally, the Committee does not feel constrained by the principles of federalism and legislative immunity, as it has decided to subpoena a sitting leader of a state legislature about matters outside its authorization without meaningful notice. Put simply, the Committee views itself as having a roving commission to examine any matter involving its political adversaries that piques its interest without any regard for the rights of the citizens subjected to its investigation. The Court must quash this Subpoena and remind the Committee that it, like all other government entities, is subject to limitations on its powers.

## Count I
### (The Subpoena Imposes an Undue Burden on Speaker Vos)

28.     Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–27 as if the same were set forth verbatim herein.

29.     Serving Speaker Vos on Saturday afternoon with notice of a first-thing-Monday-morning deposition subjects Speaker Vos to an undue burden because it does not allow Speaker Vos and his counsel a reasonable time to prepare and comply.

30.     Subpoenas should be quashed when they do not provide a reasonable time to comply. *Matter of Holsen*, No. 22-MC-24-JPS, 2022 WL 3213367, at *1 (E.D. Wis. Aug. 9, 2022) (citing Fed. R. Civ. P. 45(d)(3)(A)). Providing the subject of a subpoena with fourteen days, after service is effectuated, for compliance is the benchmark standard. *Id*. (citing *Elliot v. Mission Tr. Servs., LLC*, No. 14-CV-9625, 2015 WL 1567901, at *4 (N.D. Ill. Apr. 7, 2015)).

31.     Here, the Committee's own rules show that the minimum of notice is three business days, exclusive of Saturdays and Sundays (unless the House happens to be in session on those days). *See* **Exhibit A**, Regulations for the Use of Deposition Authority for the 117th Congress, Rule 2 (providing that the Ranking Member and other Committee members receive at least three days' written notice before a deposition, except in "exigent circumstances"). These are not exigent circumstances.

32.     Providing Speaker Vos and his counsel with less than 48 hours to comply—most of which consists of Sunday—is unreasonable. While such a minimal timeframe to comply would be unreasonable in isolation, it is especially unreasonable when viewed in light of all the circumstances surrounding this Subpoena. The

Committee has had over 14 months to subpoena Speaker Vos and chose not to. Further, the Committee has known of the conversation it wants to ask about for two months. It has approximately three additional months remaining to subpoena Speaker Vos. The Committee has had ample time to subpoena Speaker Vos and, in fact, has ample time moving forward to subpoena Speaker Vos. Only providing Speaker Vos with less than 48 hours to comply with the Subpoena is completely unnecessary and unreasonable.

33.     The true reason the Committee is only providing Speaker Vos with less than 48 hours to comply with the Subpoena is its arbitrarily set hearing schedule. On September 21, 2022, the Committee set September 28, 2022, as its next televised hearing. For reasons only known to the Committee, it believes Speaker Vos' deposition will generate interest for its self-described made-for-TV production. This motivation is not justification for providing Speaker Vos without meaningful notice of the Subpoena.

34.     The Committee sets its own hearing schedule. It could have subpoenaed Speaker Vos well in advance of the September 28th hearing, it could have postponed the September 28th hearing, or it could schedule another hearing for a later date. Rather than use any of these viable alternatives, the Committee instead chose to deprive Speaker Vos of meaningful notice and a reasonable time to comply with the Subpoena.

35.     The Committee's decision to deprive Speaker Vos of meaningful notice and a reasonable time to comply only becomes more egregious when factors unique

to Speaker Vos are examined. First, the Committee is well-aware Speaker Vos is in the closing days of a hard-fought reelection battle. The Subpoena, without warning, suddenly pulls Speaker Vos off the campaign trail, and in turn causing significant interruption to his campaign schedule. Second, the Committee is also well-aware that subpoenaing a sitting speaker of a state legislature implicates nuanced and complex constitutional issues which necessitate careful legal counsel. The Committee is attempting to deprive Speaker Vos of an opportunity to receive such counsel by providing him virtually no notice of the Subpoena.

36. Additionally, any witness appearing before the Committee is subject to prosecution for a false statement under 18 U.S.C. §1001. It is malpractice for an attorney to allow a witness to appear and to attempt to defend his deposition without prior consultation and preparation—something that would literally be impossible on the current schedule.

37. Additionally, it is impossible for Speaker Vos to comply. He is given the choice of appearing remotely, but the Subpoena he received Saturday contains no link. Further, it is prohibitively expensive—if not impossible—to fly to Washington, DC, on such short notice to appear at the Capitol.

38. The Subpoena is unreasonable because it provides less than 48 hours for Speaker Vos to comply. This unreasonableness is only heightened by the absence of justification for such an extreme lack of notice and the burden such lack of notice imposes on Speaker Vos. This Court should quash the Subpoena as unreasonable and

imposing an undue burden because it only provides Speaker Vos with less than 48 hours to comply.

## Count II
### (The Subpoena Violates Speaker Vos' Legislative Immunity and Privilege at Federal Common Law)

39. Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–38 as if the same were set forth verbatim herein.

40. Speaker Vos retains a common law legislative immunity from civil process, and it applies in federal court. *See Tenney v. Brandhove*, 331 U.S. 367, 376 (1951) (applying the immunity to a civil suit against members of a California legislative committee for their acts as legislators); *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 404 (1979) (holding that "the absolute immunity for state legislators recognized in *Tenney* reflected the Court's interpretation of federal law; the decision did not depend on the presence of a speech or debate clause in the constitution of any State, or on any particular set of state rules or procedures available to discipline erring legislators."). This privilege exists for state legislators at federal common law because the colonies and states first inherited it from the English Parliament, which had fought for the privilege in its struggles with the Crown during the English Civil War. *Tenney*, 331 U.S. at 372-375. It was eventually ensconced in the English Bill of Rights. *Id*. Our federal Speech or Debate Clause—not applicable here—is but one outpouring from this common law font. No less vital—and applicable here—is the immunity for state legislators from civil process in federal court.

41.     Here, that immunity should prohibit the effort of the Select Committee to hale Speaker Vos before them to testify—under the threat of prosecution under 18 U.S.C. § 1001 for any false statement—regarding acts he took as a legislator years after the event allegedly being investigated by the Committee.

42.     To be sure, a line of authority applies only a qualified privilege, not an absolute privilege, to efforts to cause legislators to testify in civil cases. *See, e.g., American Trucking Associations, Inc. v. Alviti*, 4 F.4th 76, 87-88 (1st Cir. 2021) (finding that Rhode Island Speaker of the House and others were not required to testify, and analogizing to *United States v. Gillock*, 445 U.S. 360 (1980), which held that evidence of a Tennessee legislator's legislative acts could be admitted at his federal bribery trial because an important federal interest in enforcing criminal statutes could overcome principles of comity that would otherwise protect state legislators).[1] However, this line of authority should not apply here, as this is neither a civil nor a criminal proceeding in which the rules of civil or criminal procedure, the scope of the pleadings and the indictment, and the superintendence of the court provide some degree of regularity and protection for witnesses. Instead, this is a committee investigation with few rules, and those that exist for regular committees are not followed by this Committee, which lacks true minority representation. The opportunity for harassment is substantial—for example, attempting to serve a

---

[1] *See also Michigan State A. Randolph Institute v. Johnson*, 2018 WL 1465767 (W.D. Mich. Jan. 4, 2018) (applying qualified immunity and a five-part test, and quashing subpoenas against legislators in civil rights action to the extent that the requested materials would have fallen within the privilege).

deposition subpoena over the weekend for a Monday deposition, when the committee has known about the matters at issue for months.

43.     More importantly, the opportunity for a mere committee of Congress to punish and chill the operation of a state legislature is only too apparent. Committee members could use the Congressional "investigative" power to target state legislators for deposition testimony or document productions with almost no notice in the critical days of a hard-fought election (as here), or worse, abruptly pull them from their duties in a close and hard-fought committee or floor vote. An investigation could be used to punish state legislators in the aftermath of votes that do not meet with the committee's approval.

44.     State legislators have no means of redress aside from courts' application of their federal common law privilege. The resources of state legislators cannot compare to that of the United States Congress. Nor is there a political remedy, as state legislatures—let alone individual legislators—have no constitutional means of politically checking or punishing congressional overreach. This subpoena, then, squarely falls within the purpose of state legislators' common law immunity, as the *Tenney* court found it in the words of James Wilson, the Founder who served on the committee that drafted the federal constitutional version:

> 'In order to enable and encourage a representative of the public to discharge
> his public trust with firmness and success, it is indispensably necessary, that
> he should enjoy the fullest liberty of speech, and that he should be protected

from the resentment of every one, however powerful, to whom the exercise of

that liberty may occasion offense.'

*Tenney*, 371 U.S. at 373. Members of Congress have state legislatures to thank for

bringing legislative immunity to this country and providing the basis for the federal

Speech or Debate Clause (*id*.). Now, under the federal common law, this Court should

ensure that they recognize those same protections for state legislators like Speaker

Vos.

## Count III
## (Subpoena Is Not Pertinent to the Authorized Inquiry)

45.     Plaintiff repeats, re-alleges, and incorporates the allegations in

paragraphs 1–44 as if the same were set forth verbatim herein.

46.     Congress' power to investigate and issue subpoenas is not unlimited and

is subject to several limitations. *Trump v. Mazars*, 140 S.Ct. 2019, 2031, 207 L.Ed.2d

951, (2020). Most importantly, a congressional subpoena "'must be related to, and in

furtherance of, a legitimate task of the Congress.'" *Id*. (quoting *Watkins v. United

States*, 354 U.S. 178, 187, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957)). Congress cannot

issue a subpoena for the purpose of law enforcement or to expose for the sake of

exposure. *Id*. at 2032. Additionally, Congress does not have a "'general' power to

inquire into private affairs and compel disclosures'" and cannot conduct an

investigation "'solely for the personal aggrandizement of the investigators or to

punish those investigated.'" *Id*.

47.     The Select Committee's supposed inquiry focuses on the events of

January 6th leading up to the Capitol breach, factors that may have caused

individuals to enter the Capitol without permission, and the statutory process of certifying states' electoral votes.

48.     The Select Committee does not seek to depose Speaker Vos about any of these topics. Rather, the Select Committee wants to depose Speaker Vos about conversations he had with former President Trump in July of 2022, more than 18 months removed from the events of January 6th and the certification of states' electoral votes.

49.     The Select Committee's theory in deposing Speaker Vos about these conversations is not clear. Speaker Vos' conversations with former President Trump pertained to a recently decided Wisconsin Supreme Court decision about Wisconsin election law and any actions that could be taken in response to this decision moving forward. These topics do not pertain to the events of January 6th, or even (to construe the authorizing resolution broadly) the events leading up to it or its immediate aftermath. The Select Committee is not authorized to conduct a free-ranging inquiry into any conversations former President Trump has, including conversations about current events and future courses of action, which pique the Committee's interest.

50.     The deposition subpoena for Speaker Vos is not pertinent to the matters the House assigned to the Select Committee. For this reason alone, the Subpoena should be quashed.

## Count IV
### (Subpoena Is Invalid Because the Select Committee Is Not Properly Constituted)

51.     Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–50 as if the same were set forth verbatim herein.

52.     The power of authorized congressional committees to issue subpoenas arises by implication from Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).

53.     The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

54.     The Speaker of the House failed to appoint members consistent with the authorizing resolution of the Select Committee. The Speaker has appointed only nine members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a), 117th Cong. (2021).

55.     Further, of those nine Members the Speaker has appointed, none of them were appointed after consultation with the Minority Leader, as is required by Section 2(a) of the authorizing resolution.

56.     The composition and membership of a purported committee, including the Select Committee, is material to its power to act. A committee's composition and membership can determine the direction of an inquiry and can serve to check, or temper, committee actions that could otherwise prove injurious to the operation of the government or the rights of private citizens. A committee that, without any check, exclusively serves the political purposes of one political party or faction is susceptible to grave conditional error and overreach.

57.     Here, the Select Committee has embarked upon an investigation that began with an inquiry into January 6th, but, in the absence of any tempering influence from the opposition party, has transformed into a broad assault on the Select Committee's political opponents, including private citizens.

58.     The Select Committee's failure to ever become properly constituted is a material violation of its authorizing Resolution. A private citizen aggrieved by a material violation of House rules has a defense against compulsory process. In *Yellin v. United States*, 374 U.S. 109, 114 (1963), the House Un-American Affairs Committee failed to follow Rule IV, which required the committee to weigh certain considerations and act upon the express request of Yellin, the witness, for executive session because he believed his public testimony would harm his reputation. The Court held that because the committee had not followed Rule IV, Yellin could not be convicted for contempt of Congress for failing to answer questions about his political affiliation and activities. It was not necessary to the Court's decision in *Yellin* that the committee would or should have granted Yellin's request for private, executive session testimony; the holding rests upon the committee's failure to actually apply Rule IV in considering his request. As *Yellin* shows, then, the House's failure to follow a rule is particularly significant where a person's fundamental rights are involved. That is the case here, where Speaker Vos is deprived of meaningful notice and is subject to an infringement of his legislative immunity from civil service.

59.     Thus, because the Select Committee is not a duly constituted Select Committee under the applicable Resolution, it has no authority to act by issuing

compulsory process against private entities and citizens. Chairman Thompson's Subpoena is invalid and unenforceable.

## COUNT V
### (Temporary and Permanent Injunctive Relief is Warranted)

60. Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–59 as if the same were set forth verbatim herein.

61. "A temporary restraining order, as opposed to a preliminary injunction, is sought and heard on an emergency basis. The purpose of a temporary restraining order is to preserve the status quo pending the complete briefing and consideration of a motion for a preliminary injunction." *Faust v. Vilsack*, 519 F. Supp. 3d 470, 474 (E.D. Wis. 2021).

62. "In general, the showing required for a temporary restraining order and a preliminary injunction are the same. Specifically, a plaintiff must show that '(1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims.'" *Id.* (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) and quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)).

63. Without a TRO, Speaker Vos will undoubtedly suffer irreparable harm. Specifically, without relief from this Court, he faces the Hobson's choice of: (1) attending a high-profile and high-stakes Congressional Committee deposition without preparation with counsel; or (2) risk being held in contempt of Congress.

64. As to the second factor, it is quite clear that traditional legal remedies are inadequate. Indeed, if the Select Committee were following its own Rules,

traditional legal principles, and the rule of law, it would not serve a legislative leader with a Saturday-afternoon subpoena seeking Monday-morning deposition. In short, this subpoena is extraordinary, and it requires an extraordinary response.

65.     Finally, Speaker Vos has not just some likelihood, but a high probability of succeeding on the merits of his claims. As set forth above, (1) the Subpoena imposed a burden that is not only "undue," and in violation of Committee rules, but that borders on the absurd; (2) Speaker Vos has absolute legislative immunity, and the Select Committee may not interfere with his right to participate in the legislative process; (3) the Select Committee is seeking testimony on a subject outside the scope of its stated purposes as set forth in the authorizing Resolution; and (4) because the Select Committee was not properly constituted, the Subpoena is invalid.

66.     For these reasons, a TRO is appropriate.

67.     A plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.*

68.     On the first factor, Speaker Vos will face irreparable harm if forced to sit for an unlawful deposition notice issued by the Select Committee.

69.     On the second factor, as set forth above, there is no traditional legal remedy that could afford Speaker Vos relief.  No amount of money can compensate a legislative leader who is forced to knuckle-under and comply with an unlawful Subpoena that imposes an undue burden, violates legislative immunity, and contravenes principles of federalism and federal-state comity.

70.     Third, the balance of equities favor Speaker Vos.  The Select Committee waited 14 months to seek testimony from Speaker Vos and two months after learning of the single discussion for which it seeks to compel testimony.  If it were serious about needing his testimony, the Select Committee would not have waited until two days before its final televised hearing to seek Speaker Vos' testimony.  In short, the equities favor a permanent injunction against the Subpoena.

71.     Fourth, and finally, the public interest would be served by quashing this Subpoena.  If a state legislative leader can be haled before Congress—on two days' notice—anytime he receives a phone call from a former President, there is no limit to the mischief a Congressional Committee could engage in, either for partisan purposes or good old-fashioned harassment.  The public has a decided interest in protecting legislative leaders from being targeted for engaging in the political process.

72.     Accordingly, a TRO and permanent injunction are warranted.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court schedule a hearing within 72 hours and, after such a hearing, impose a TRO preventing Defendant from enforcing the Subpoena while this case is pending and, upon resolution of this case, enter judgment in his favor and against the Defendants as follows:

1. A declaratory judgment that the Subpoena is invalid and unenforceable;

2. A permanent injunction quashing the Subpoena;

3. Plaintiff's reasonable costs and expenses, including attorneys' fees; and

4. All other preliminary and permanent relief to which Plaintiff is entitled.

Dated: September 25, 2022

Respectfully submitted,

**GRAVES GARRETT, LLC**

*/s/ Edward D. Greim*
Edward D. Greim (Mo. Bar #54034)*
Paul Brothers (Mo. Bar # 68704)*
1100 Main Street, Suite 2700
Kansas City, MO 64105
Phone: (816) 256-3181
edgreim@gravesgarrett.com
pbrothers@gravesgarrett.com

*Pro Hac Vice Applications Forthcoming*

**CRAMER, MULTHAUF & HAMMES, LLP**

*/s/ Matthew M. Fernholz*
Matthew M. Fernholz (Wis. Bar # 1065765)
Ashley E. McNulty (Wis. Bar # 1107355)
1601 E. Racine Ave., Suite 200
Waukesha, WI 53186
Phone: (262) 542-4278
mmf@cmhlaw.com
aem@cmhlaw.com

**LAWFAIR LLC**
*/s/ Adam K. Mortara*
Adam K. Mortara (Wis. Bar No. 1038391)
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
Phone: (773) 750-7154
mortara@lawfairllc.com

*Counsel for Plaintiff*