# H. Res. 503

## *In the House of Representatives, U. S.,*

*June 30, 2021.*

Whereas January 6, 2021, was one of the darkest days of our democracy, during which insurrectionists attempted to impede Congress's Constitutional mandate to validate the presidential election and launched an assault on the United States Capitol Complex that resulted in multiple deaths, physical harm to over 140 members of law enforcement, and terror and trauma among staff, institutional employees, press, and Members;

Whereas, on January 27, 2021, the Department of Homeland Security issued a National Terrorism Advisory System Bulletin that due to the "heightened threat environment across the United States," in which "[S]ome ideologically-motivated violent extremists with objections to the exercise of governmental authority and the presidential transition, as well as other perceived grievances fueled by false narratives, could continue to mobilize to incite or commit violence." The Bulletin also stated that—

(1) "DHS is concerned these same drivers to violence will remain through early 2021 and some DVEs [domestic violent extremists] may be emboldened by the January 6, 2021 breach of the U.S. Capitol Building in Washington, D.C. to target elected officials and government facilities."; and

(2) "Threats of violence against critical infrastructure, including the electric, telecommunications and healthcare sectors, increased in 2020 with violent extremists citing misinformation and conspiracy theories about COVID–19 for their actions";

Whereas, on September 24, 2020, Director of the Federal Bureau of Investigation Christopher Wray testified before the Committee on Homeland Security of the House of Representatives that—

(1) "[T]he underlying drivers for domestic violent extremism – such as perceptions of government or law enforcement overreach, sociopolitical conditions, racism, anti-Semitism, Islamophobia, misogyny, and reactions to legislative actions – remain constant.";

(2) "[W]ithin the domestic terrorism bucket category as a whole, racially-motivated violent extremism is, I think, the biggest bucket within the larger group. And within the racially-motivated violent extremists bucket, people subscribing to some kind of white supremacist-type ideology is certainly the biggest chunk of that."; and

(3) "More deaths were caused by DVEs than international terrorists in recent years. In fact, 2019 was the deadliest year for domestic extremist violence since the Oklahoma City bombing in 1995";

Whereas, on April 15, 2021, Michael Bolton, the Inspector General for the United States Capitol Police, testified to the Committee on House Administration of the House of Representatives that—

(1) "The Department lacked adequate guidance for operational planning. USCP did not have policy and procedures in place that communicated which personnel were responsible for operational planning, what type of oper-

ational planning documents its personnel should prepare, nor when its personnel should prepare operational planning documents."; and

(2) "USCP failed to disseminate relevant information obtained from outside sources, lacked consensus on interpretation of threat analyses, and disseminated conflicting intelligence information regarding planned events for January 6, 2021."; and

Whereas the security leadership of the Congress under-prepared for the events of January 6th, with United States Capitol Police Inspector General Michael Bolton testifying again on June 15, 2021, that—

(1) "USCP did not have adequate policies and procedures for FRU (First Responder Unit) defining its overall operations. Additionally, FRU lacked resources and training for properly completing its mission.";

(2) "The Department did not have adequate policies and procedures for securing ballistic helmets and vests strategically stored around the Capitol Complex."; and

(3) "FRU did not have the proper resources to complete its mission.": Now, therefore, be it

*Resolved,*

**SECTION 1. ESTABLISHMENT.**

There is hereby established the Select Committee to Investigate the January 6th Attack on the United States Capitol (hereinafter referred to as the "Select Committee").

**SEC. 2. COMPOSITION.**

(a) APPOINTMENT OF MEMBERS.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader.

(b) DESIGNATION OF CHAIR.—The Speaker shall designate one Member to serve as chair of the Select Committee.

(c) VACANCIES.—Any vacancy in the Select Committee shall be filled in the same manner as the original appointment.

**SEC. 3. PURPOSES.**

Consistent with the functions described in section 4, the purposes of the Select Committee are the following:

(1) To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the "domestic terrorist attack on the Capitol") and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement agencies in the National Capital Region and other instrumentalities of government, as well as the influencing factors that fomented such an attack on American representative democracy while engaged in a constitutional process.

(2) To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted vi-

olence and domestic terrorism relevant to such terrorist attack.

(3) To build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack.

**SEC. 4. FUNCTIONS.**

(a) FUNCTIONS.—The functions of the Select Committee are to—

(1) investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including facts and circumstances relating to—

(A) activities of intelligence agencies, law enforcement agencies, and the Armed Forces, including with respect to intelligence collection, analysis, and dissemination and information sharing among the branches and other instrumentalities of government;

(B) influencing factors that contributed to the domestic terrorist attack on the Capitol and how technology, including online platforms, financing,

and malign foreign influence operations and campaigns may have factored into the motivation, organization, and execution of the domestic terrorist attack on the Capitol; and

(C) other entities of the public and private sector as determined relevant by the Select Committee for such investigation;

(2) identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol regarding—

(A) the command, control, and communications of the United States Capitol Police, the Armed Forces, the National Guard, the Metropolitan Police Department of the District of Columbia, and other Federal, State, and local law enforcement agencies in the National Capital Region on or before January 6, 2021;

(B) the structure, coordination, operational plans, policies, and procedures of the Federal Government, including as such relate to State and local governments and nongovernmental entities, and particularly with respect to detecting, preventing, preparing for, and responding to targeted violence and domestic terrorism;

(C) the structure, authorities, training, manpower utilization, equipment, operational planning, and use of force policies of the United States Capitol Police;

(D) the policies, protocols, processes, procedures, and systems for the sharing of intelligence and other information by Federal, State, and local agencies with the United States Capitol Police, the Sergeants at Arms of the House of Representatives and Senate, the Government of the District of Columbia, including the Metropolitan Police Department of the District of Columbia, the National Guard, and other Federal, State, and local law enforcement agencies in the National Capital Region on or before January 6, 2021, and the related policies, protocols, processes, procedures, and systems for monitoring, assessing, disseminating, and acting on intelligence and other information, including elevating the security posture of the United States Capitol Complex, derived from instrumentalities of government, open sources, and online platforms; and

(E) the policies, protocols, processes, procedures, and systems for interoperability between the United States Capitol Police and the National

Guard, the Metropolitan Police Department of the District of Columbia, and other Federal, State, and local law enforcement agencies in the National Capital Region on or before January 6, 2021; and

(3) issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary.

(b) REPORTS.—

(1) INTERIM REPORTS.—In addition to the final report addressing the matters in subsection (a) and section 3, the Select Committee may report to the House or any committee of the House from time to time the results of its investigations, together with such detailed findings and legislative recommendations as it may deem advisable.

(2) TREATMENT OF CLASSIFIED OR LAW ENFORCEMENT-SENSITIVE MATTER.—Any report issued by the Select Committee shall be issued in unclassified form but may include a classified annex, a law enforcement-sensitive annex, or both.

(c) CORRECTIVE MEASURES DESCRIBED.—The corrective measures described in this subsection may include changes in law, policy, procedures, rules, or regulations that could be taken—

(1) to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions;

(2) to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans; and

(3) to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism.

(d) NO MARKUP OF LEGISLATION PERMITTED.—The Select Committee may not hold a markup of legislation.

**SEC. 5. PROCEDURE.**

(a) ACCESS TO INFORMATION FROM INTELLIGENCE COMMUNITY.—Notwithstanding clause 3(m) of rule X of the Rules of the House of Representatives, the Select Committee is authorized to study the sources and methods of entities described in clause 11(b)(1)(A) of rule X insofar as such study is related to the matters described in sections 3 and 4.

(b) TREATMENT OF CLASSIFIED INFORMATION.—Clause 11(b)(4), clause 11(e), and the first sentence of clause 11(f) of rule X of the Rules of the House of Representatives shall apply to the Select Committee.

(c) APPLICABILITY OF RULES GOVERNING PROCEDURES OF COMMITTEES.—Rule XI of the Rules of the House of

Representatives shall apply to the Select Committee except as follows:

(1) Clause 2(a) of rule XI shall not apply to the Select Committee.

(2) Clause 2(g)(2)(D) of rule XI shall apply to the Select Committee in the same manner as it applies to the Permanent Select Committee on Intelligence.

(3) Pursuant to clause 2(h) of rule XI, two Members of the Select Committee shall constitute a quorum for taking testimony or receiving evidence and one-third of the Members of the Select Committee shall constitute a quorum for taking any action other than one for which the presence of a majority of the Select Committee is required.

(4) The chair of the Select Committee may authorize and issue subpoenas pursuant to clause 2(m) of rule XI in the investigation and study conducted pursuant to sections 3 and 4 of this resolution, including for the purpose of taking depositions.

(5) The chair of the Select Committee is authorized to compel by subpoena the furnishing of information by interrogatory.

(6)(A) The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to

subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress.

(B) Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted by the chair of the Committee on Rules for printing in the Congressional Record on January 4, 2021.

(7) Subpoenas authorized pursuant to this resolution may be signed by the chair of the Select Committee or a designee.

(8) The chair of the Select Committee may, after consultation with the ranking minority member, recognize—

　　(A) Members of the Select Committee to question a witness for periods longer than five minutes as though pursuant to clause 2(j)(2)(B) of rule XI; and

　　(B) staff of the Select Committee to question a witness as though pursuant to clause 2(j)(2)(C) of rule XI.

(9) The chair of the Select Committee may postpone further proceedings when a record vote is ordered on questions referenced in clause 2(h)(4) of rule XI, and

may resume proceedings on such postponed questions at any time after reasonable notice. Notwithstanding any intervening order for the previous question, an underlying proposition shall remain subject to further debate or amendment to the same extent as when the question was postponed.

(10) The provisions of paragraphs (f)(1) through (f)(12) of clause 4 of rule XI shall apply to the Select Committee.

### SEC. 6. RECORDS; STAFF; TRAVEL; FUNDING.

(a) SHARING RECORDS OF COMMITTEES.—Any committee of the House of Representatives having custody of records in any form relating to the matters described in sections 3 and 4 shall provide copies of such records to the Select Committee not later than 14 days of the adoption of this resolution or receipt of such records. Such records shall become the records of the Select Committee.

(b) STAFF.—The appointment and the compensation of staff for the Select Committee shall be subject to regulations issued by the Committee on House Administration.

(c) DETAIL OF STAFF OF OTHER OFFICES.—Staff of employing entities of the House or a joint committee may be detailed to the Select Committee to carry out this resolution and shall be deemed to be staff of the Select Committee.

(d) U<small>SE OF</small> C<small>ONSULTANTS</small> P<small>ERMITTED</small>.—Section 202(i) of the Legislative Reorganization Act of 1946 (2 U.S.C. 4301(i)) shall apply with respect to the Select Committee in the same manner as such section applies with respect to a standing committee of the House of Representatives.

(e) T<small>RAVEL</small>.—Clauses 8(a), (b), and (c) of rule X of the Rules of the House of Representatives shall apply to the Select Committee.

(f) F<small>UNDING</small>; P<small>AYMENTS</small>.—There shall be paid out of the applicable accounts of the House of Representatives such sums as may be necessary for the expenses of the Select Committee. Such payments shall be made on vouchers signed by the chair of the Select Committee and approved in the manner directed by the Committee on House Administration. Amounts made available under this subsection shall be expended in accordance with regulations prescribed by the Committee on House Administration.

## SEC. 7. TERMINATION AND DISPOSITION OF RECORDS.

(a) T<small>ERMINATION</small>.—The Select Committee shall terminate 30 days after filing the final report under section 4.

(b) D<small>ISPOSITION OF</small> R<small>ECORDS</small>.—Upon termination of the Select Committee—

(1) the records of the Select Committee shall become the records of such committee or committees designated by the Speaker; and

(2) the copies of records provided to the Select Committee by a committee of the House under section 6(a) shall be returned to the committee.

Attest:

*Clerk.*