## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **ROBIN VOS,** | |
| Plaintiff, | Civil Action No. 2:22-cv-01119 |
| v. | |
| **UNITED STATES HOUSE OF REPRESENTATIVES SELECT COMMITTEE TO INVESTIGATE THE JANUARY 6TH ATTACK ON THE UNITED STATES CAPITOL** Longworth House Office Building Washington, D.C. 20515 | |
| **BENNIE G. THOMPSON, in his official capacity as Chairman of the House Select Committee to Investigate the January 6th Attack on the United States Capitol,** Long Worth House Office Building Washington, D.C. 20515 | |
| Defendants. | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION & DECLARATORY JUDGMENT

The Court should issue a preliminary injunction and declaratory judgment prohibiting Defendants from enforcing the Subpoena for deposition testimony they issued to Plaintiff, Speaker of the Wisconsin Assembly Robin Vos, on September 23, 2022. The Subpoena is unlawful for three reasons.

First, it does not serve one of the Defendant Committee's authorized purposes. The Committee is to investigate the events of January 6th, the events that led up to and caused January 6th, and the impact of those events on the peaceful transfer of

power in January 2021. It is also to propose three specific types of legislation targeted to those specific areas of inquiry. The requested testimony, in contrast, is solely about a request Speaker Vos allegedly received in July 2022 pertaining to proposed legislative action in the wake of a July 2022 Wisconsin Supreme Court decision. That conversation is not within the Committee's three-part investigative authorization, and this is a sufficient and independent reason for granting Speaker Vos relief.

Second, the Subpoena infringes upon Speaker Vos' legislative privilege as a state legislator, which, as discussed below, is enforceable in federal court as a matter of federal common law, notwithstanding the Committee's own privileges.

Third, the Subpoena was issued by an improperly formed committee that lacks members authorized to speak for the House minority and, most importantly, a Ranking Member from that minority. This flaw in its creation impacts the Committee even today, and has seriously compromised Speaker Vos' rights. It means that in issuing the Subpoena and in the deposition that would follow, the House has failed— and will fail—to comply with House regulations that confer important rights and duties on the Ranking Member and that are intended to protect core rights of witnesses like Speaker Vos. Such violations of House resolutions and regulations are material, and can be raised by witnesses seeking the protection of federal courts.

Finally, this Court has jurisdiction to reach these substantive issues, and the Defendants cannot strip Speaker Vos of his constitutional defenses to their actions by asserting their own constitutional immunity. Accordingly, this Court must declare the Subpoena unlawful and enjoin Defendants from enforcing it.

## Statement of Facts

Speaker Robin Vos is the elected representative for Wisconsin's 63rd Assembly District and serves as the Speaker of the Wisconsin General Assembly. Biography of Speaker Robin Vos, Wisconsin Legislature (Exhibit A).[1] He has served as the elected representative for the 63rd Assembly District since 2005 and as Speaker of the Wisconsin General Assembly since 2013. *Id.*

On June 30, 2021, The United States' House of Representatives passed House Resolution 503 (the Resolution) and established the Select Committee to Investigate the January 6th Attack on the United States Capitol (the Committee). The Committee has three purposes under the Resolution. They are: (1) to "investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021 domestic terrorist attack on the United States Capitol Complex … and relating to the interference with the peaceful transfer of power, including the facts and causes relating to the preparedness and response of [law enforcement and other instrumentalities of government], as well as the influencing factors that fomented such an attack…."; (2) to "examine and evaluate evidence developed by relevant Federal, state, and local government agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack"; and (3) to "build upon the investigations of other entities and avoid unnecessary duplication of efforts by

---

[1] Plaintiff requests this Court take judicial notice of Exhibits A, B, C, D, E, F, G, & H pursuant to Fed. R. Evid. 201 because each of these exhibits were taken directly form the Congressional record or the Committee's own website (as established by the attached affidavit of Edward Greim), and their accuracy cannot reasonably be questioned.

reviewing the investigations, findings, conclusions, and recommendations of other [investigations] into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack." H.R. Res. 503, § 3, 117th Cong. (2021) (Exhibit B).

The Resolution also provided the Committee with guidelines for the corrective measures it could consider and propose. Specifically, the Resolution authorized the Committee to recommend "changes in law, policy, procedures, rules, or regulations that could be taken–(1) to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American Democratic institutions; (2) to improve the security posture of the United States Capitol Complex while preserving the accessibility of the Capitol Complex for all Americans; and (3) to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism." Exhibit B, Section 4(c).

The Resolution required the Speaker of the House (Speaker) to appoint thirteen members to the Committee. Exhibit B, Section 2(a). The Resolution also required the Speaker to appoint five of the thirteen members in consultation with the Minority Leader. Exhibit B, Section 2(b). The Speaker only appointed a total of nine members to the Committee. Dkt. 2, ¶ 14; H.R. Journal, 117th Cong., 1st Sess. 3597 (2021) (Exhibit C); H.R. Journal, 117th Cong., 1st Sess. 3885–3886 (2021) (Exhibit D). The Speaker also rejected the Minority Leader's group of appointees and appointed all nine members on her own without consultation from the Minority

Leader. *Id.* As composed, the Committee has nine members with one member serving as Chair and another member serving as Vice-Chair. *Id.*; Statement of Chairman Thompson, September 2, 2021 (Exhibit E).

The Resolution also requires the Committee to follow House rules for conducting depositions. Exhibit B, Section 5(c)(6)(B). These rules provide several key limitations on the Committee's handling of depositions. First, the Chair must provide three days' written notice, excluding Saturdays, Sundays, and legal holidays (unless the House is in session on those days), to all members of the Committee before conducting a deposition except in exigent circumstances. Second, the Committee must conduct depositions in rounds. During each round the majority and minority must receive equal time for questioning, and the time allowed for questioning per side per round may not exceed sixty minutes. If the Committee elects to have counsel question the witness, each side may designate only one attorney to question the witness per round for a total of two attorneys per round. H.R. Journal, 117th Cong., 1st Sess. 41 (2021) (Exhibit F).

In the event the witness, or their counsel, asserts an objection during a deposition, the Chair of the Committee must rule on the objection. Any member of the Committee may appeal the Chair's ruling to the full committee. Lastly, the Chair and Ranking Member of the Committee must consult regarding the release of deposition testimony. If either the Chair or Ranking Member objects in writing to the proposed release of deposition testimony, the matter is referred to the full Committee to resolve. *Id.*

The Committee held its first hearing on July 27, 2021, and has held a total nine hearings. Dkt. 2, ¶20. According to the Committee, over its 14-month investigation, it has interviewed or deposed over one thousand witnesses and collected an untold number of documents and communications.

On the afternoon of Saturday, September 24, 2022, the Committee personally served Speaker Vos with a Subpoena demanding his deposition testimony in less than 48 hours on the on the morning of September 26, 2022. Subpoena of Speaker Robin Vos (Exhibit G). The cover letter accompanying the Subpoena claimed the Committee wanted to urgently depose Speaker Vos because at least one public report from July 2022, disclosed that former President Donald Trump had called Speaker Vos the previous week to discuss a Wisconsin Supreme Court ruling barring the use of drop-off boxes for absentee ballots in future elections and requested Speaker Vos "take measures to change the result of the 2020 Presidential election in Wisconsin." *Id.*

Speaker Vos filed this litigation on the evening of Sunday, September 25, 2022. After this litigation was filed, the Committee postponed Speaker Vos' scheduled deposition. Speaker Vos and the Committee then entered into a stipulation under which the Committee agreed not to take any actions to enforce the Subpoena while this litigation is pending, and Speaker Vos and the Committee agreed to an expedited briefing scheduling and to consolidate this motion with trial on the merits under Fed. R. Civ. P. 65(a)(2). Dkt. 15. Speaker Vos files this motion for a preliminary injunction and declaratory injunction in compliance with the agreed briefing schedule.

## Legal Standard

District courts may, in the case of an actual controversy within their jurisdiction, "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Amling v. Harrow Industries, LLC*, 943 F.3d 373, 377 (7th Cir. 2019) (quoting 28 U.S.C. § 2201(a)). A declaratory judgment action is ripe "when 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2004)).

Plaintiff also seeks a preliminary injunction and, in this proceeding which is consolidated with trial on the merits, permanent injunctive relief. "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 (1987). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Saint Anthony Hosp. v. Eagleson*, 40 F.4th 492, 513 (7th Cir. 2022) (quoting *Rizzo v. Goode*, 423 U.S. 362, 376-77 (1976)). Other than a default judgment, every other final judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed.

R. Civ. P. 54(c). Here, Plaintiff simply seeks a final judgment declaring that the Subpoena is unenforceable and enjoining its enforcement.

## Argument

## I.     The Court has subject matter jurisdiction over the Committee.

The Court has subject matter jurisdiction over the Committee. While the Speech or Debate Clause[2] provides Congress and its members and community with *immunity* from civil actions in certain cases, that analysis does not decide the subject matter jurisdiction of this Court. For decades—and now, over the past year—federal courts at all levels have exercised their Article III jurisdiction over justiciable cases and controversies to determine the validity of various Congressional subpoenas in a variety of contexts. They have exercised Article III jurisdiction not only in cases where (as here) the subpoena threatens to exacerbate a tension already inherent in the constitutional structure, such as in the separation of powers among the three branches of the federal government. They have also exercised jurisdiction where the subpoena "merely" threatens individual constitutional rights.

### (a) This is a structural conflict, and so heightened scrutiny applies.

The closest analogy to the jurisdictional issue in this case is *Trump v. Mazars USA LLP*, 207 L. Ed. 2d 951, 140 S. Ct. 2019, 2031 (2020). There, the Supreme Court dealt with a dispute that was "the first of its kind to reach this Court": three House

---

[2] The Clause provides, in relevant part, that members of Congress "shall in all Cases, except Treason, Felony, and Breach of the Peace, be privileged from Arrest during their attendance at the Session of their Respective Houses, and in going to and from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place." United States Constitution, Article I, § 6.

committees' subpoenas for records from President Donald Trump's financial institutions and advisers. *Id*. The Court did not dispute that the parties' controversy—which they had litigated through two district courts and two different circuits—was "justiciable." *Id*. That was so, even though there was no direct conflict between the legislative and executive branches: Congress had only requested personal and private records of the president, which were not official records and not subject to executive privilege claims.

Rather than relying solely on case law in which private parties had raised constitutional objections to congressional subpoenas, the Court recognized that there was still "significant separation of powers issues," as "Congress could declare open season on the President's information held by schools, archives, internet service providers, e-mail clients, and financial institutions." *Id*. at 2033-2035. Observing that "[t]he Constitution does not tolerate such ready evasion; it 'deals with substance, not shadows,'" the Court fashioned a non-exclusive four-part test by which courts could resolve a President's civil litigation challenging Congressional subpoenas. *Id*. at 2035 (quoting *Cummings v. Missouri*, 4 Wall. 277, 325, 18 L.Ed. 356 (1867).)

Under that test, the Court would first "carefully assess whether the asserted legislative purpose warrants the significant step of involving the President [here, the state legislator] and his papers." *Mazars*, 140 S.Ct. at 2035. Second, "courts should insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective." *Id*. Third, "courts should be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative

purpose." *Id*. Fourth, "courts should be careful to assess the burdens imposed on the President [here, the Speaker of the Wisconsin Assembly] by a subpoena." *Id*. Again, these special considerations applied even though the Court did not impose the stricter standards that would have applied had the President invoked executive privilege, or had the papers related to official government business.

The *Mazars* standard of heightened scrutiny should apply here, as this case too is the "first of its kind." *Id*. at 2031. The Subpoena implicates an interest in federalism and federal-state comity that is at least as important as the lessened—not core—separation of powers concerns that motivated the Supreme Court's new test in *Mazars*. *See Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) (federal courts could not entertain civil actions against state legislators, even under Congressionally-created causes of action for civil rights violations, because Congress respected state legislative immunity). As *Tenney* explained, this is a core interest: "We cannot believe that Congress—itself a staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us." *Id*. This consideration is so strong that it retains some force even in cases on the far end of the immunity spectrum—unlike the present—where state legislators are accused of a federal crime and information is being sought against them. *See U.S. v. Gillock*, 445 U.S. 360, 373 (1981) (concluding that "principles of comity command careful consideration," but yields where "important federal interests are at stake, as in the enforcement of federal criminal statutes").

Here, as more fully discussed below, the danger to the federal structure of our Constitution and federal-state comity is apparent. Just as Congress could target and harass the Executive, shifting the constitutional balance of power by subpoenaing personal papers and records without cause, Congress could target and harass state legislators with subpoenas without cause, bending state legislatures to the federal will without using the constitutionally-prescribed means of passing preemptive legislation under Article VI, § 2, the Supremacy Clause. "One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Tenney*, 341 U.S. at 377. In short, because the Constitution "deals with substance, not shadows" Court should exercise jurisdiction under a *Mazars*-like standard that judges state legislators' civil actions to protect themselves from congressional subpoenas by requiring a tighter fit between the subpoena and the proposed legislative purpose to be served.

**(b) Jurisdiction is also appropriate under the *Eastland* test for purely individual claims that do not raise structural constitutional concerns.**

Independent of *Mazars*, however, the Court can also exercise Article III jurisdiction under the two-part test articulated in *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501–04 (1975). There, the U.S. Servicemen's Fund challenged congressional subpoenas for its bank records, which Congress sought in order to determine the identity of its donors. *Id*. The Fund raised First Amendment

Case 2:22-cv-01119-PP   Filed 10/04/22   Page 11 of 26   Document 17

arguments, while Congress pointed out that the records could show that the Fund was receiving funds from foreign sources or subversive organizations, which might in turn establish violations of the federal law, the enforcement of which Congress was investigating. *Id*., at 506-507. Faced with this purely private challenge, *Eastland* made clear that federal courts do have jurisdiction to resolve the Speech and Debate Clause immunity question under a two-part test. *Id*. at 504–07.

First, the issuance of the subpoena must be within the "legitimate legislative sphere." *Id*. at 504–05. Issuance of subpoenas by a congressional committee fall within the legitimate legislative sphere when the subpoenas are issued pursuant to an authorized investigation. *Id*. at 505–06. Second, the subpoena's target must be properly within the scope of the authorized investigation. *Id*. at 506–07.

Whether it applies the *Mazars* or the *Eastland* test to the question of federal legislative immunity, this Court does have Article III jurisdiction to entertain a state legislator's challenge to a subpoena commanding him to testify to statements made by him in his legislative capacity, and to his own view regarding the powers of the legislative body—the Assembly—which he serves and leads as Speaker.

## II. The Speech or Debate Clause Does Not Immunize Congress from Defending a Constitutional Claim Testing Its Authority to Compel State Legislators to Testify Regarding Their Official Acts.

Under the four-part test in *Mazars* or, at worst, under the two-part test in *Eastland*, this Court should take up Speaker Vos' challenge to the Subpoena and should find that the immunity of the Speech or Debate Clause does not apply here.

## A. The Subpoena is not issued pursuant to the Committee's authorized investigation.

The Subpoena is focused on a July 2022 phone call the former President Trump made to Speaker Vos about a July 2022 Wisconsin Supreme Court decision,[3] and President Trump's alleged request that Speaker Vos "take measures to change the result of the 2020 Presidential election in Wisconsin," which Speaker Vos answered by telling President Trump that it was "not allowed under the Wisconsin constitution." See Exhibit G. These events—a peaceful request for a peaceful, if unconstitutional, action by the State Legislature long after the fact of the 2020 election, and the Speaker of the Assembly's answer—are far outside the investigation the House authorized the Committee to conduct last year. The House authorized the Committee to conduct an investigation of: (1) the events of January 6, 2021, (2) the causes of those events, and (3) the relation of those events to interference with the peaceful transfer of power. Exhibit B, Section 3(1). The former President's future acts, and future acts of state legislatures divorced from the events of January 6, 2021, are simply not before this Committee.

Even if Congress were to now supplement the Committee's investigative authority by allowing it to haul before it any person who today expresses views about the election itself or who today still peacefully advocates or "lobbies" for legislative

---

[3] The Wisconsin Supreme Court decision, issued July 8, 2002, held that so-called drop boxes cannot be authorized by the Wisconsin Election Commission for use in future elections because the legislature did not authorize drop boxes by law, and because under the law, it is the elector who must personally deliver an absentee ballot to the municipal clerk at the clerk's office. See *Teigen, et al. v. Wisconsin Elections Commission, et al.*, 2022 WI 64, ¶¶72-87, 403 Wis.2d 607, 655-664, 976 N.W.2d 519, 543-547, (Wis. 2022). The decision granted the requested injunctive and declaratory relief and did not address or concern the validity of the 2020 election results.

action to reverse the result, Speaker Vos would not fall within those areas of inquiry. *Teigen*, the Wisconsin Supreme Court drop-box case that allegedly precipitated the call, can be studied without compelling the State Assembly Speaker (a non-party to the case) to talk about it. And to the extent the Committee is interested in former President Trump's views regarding the case, the Wisconsin Legislature, or his endorsement of Speaker Vos's primary opponent, the former President has published those views and they are known to the world. See *Trump Knocks Vos as 'RINO,' Endorses his Primary Opponent*, WISPOLITICS, Aug. 3, 2022.[4] Again, though, these are new topics. They have no bearing on the causes of the events of January 6th or the peaceful transfer of power in January of 2021, as the conversation and requested legislative action occurred over 18 months after all of these events. Speaker Vos' opinions on these late events—if he harbors any—are not a legitimate subject of Committee inquiry and cannot possibly help inform the drafting of legislation.

The failure of the Subpoena to fall withing the investigative task assigned to the Committee is fatal to immunity because it violates part one of the *Eastman* test, 421 U.S. at 505–06 (they do not fall within the "authorized investigation" for this Committee), and the first three prongs of *Mazars,* 140 S.Ct. at 2035 (the legislative purpose does not "warrant" involving the Wisconsin Assembly Speaker; the Subpoena is broader than it needs to be to fulfill any legitimate legislative purpose; and the Committee's Letter does not provide evidence that this 2022 conversation has anything to do with January 6th, the events leading up to it, or problems with the

---

[4] Available at http://www.wispolitics.com/2022/trump-knocks-vos-as-rino-endorses-his-primary-opponent.

peaceful transfer of power). Congressional committees do not have general authority to issue subpoenas regarding any matter they desire. *Watkins v. U.S.*, 354 U.S. 178, 187 (1957).

As the Court in *Mazars* cautioned, "Congress may not rely on the President's [here, Speaker Vos'] information if other sources could reasonably provide Congress the information it needs in light of its particular legislative objective." 140 S.Ct. at 2035. Further, unlike in criminal investigations, "efforts to craft legislation involve predictive policy judgments that are 'not hamper[ed] ... in quite the same way' when every scrap of potentially relevant evidence is not available." *Id*. at 2035-2036.

In short, because the Subpoena was not issued pursuant to the Committee's authorized investigation, the Committee cannot invoke Speech or Debate Clause Immunity in this case. Therefore, this Court should address the merits of Speaker Vos' claims.

### B. Speaker Vos is not properly within the scope of the Committee's authorized investigation because he is the Speaker of the Wisconsin General Assembly and has legislative immunity and privilege.

Speaker Vos' own legislative immunity and privilege applies here. It applies not to nullify the Speech or Debate Clause, but simply to allow federal courts to move past Congress' immunity from suit so that they can decide which set of interests—the federal interests in obtaining the information, or the state interest in avoiding harassment from being questioned elsewhere on state legislative functions—should prevail on the merits. In addition to the first part of the test outlined above in subsection A, *Eastland* also sets aside Congressional immunity (but again, does not

automatically allow plaintiffs to prevail) where the target is not properly within the scope of the Committee's authorized investigation. *Id.*, 421 U.S. at 506-507.

Here, a state legislative immunity renders state legislators and their actions "not properly within the scope" of the Committee's authorized investigation. The Committee seeks to question the Speaker of the Wisconsin General Assembly about matters solely related to his position and responsibilities as Speaker. State legislators have legislative immunity and privilege for their actions as legislators. *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951). This immunity is secured by federal common law. *Id.* at 372–375.

Legislative privilege prohibits inquiry into acts concerning the legislative process and the motivation for those acts. *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015). When the purpose of a deposition subpoena issued to a state legislator is to question them about matters solely within the legislative privilege, courts have quashed the subpoenas. See *American Trucking Associations, Inc. v. Alviti*, 14 F.4th 76, 90 (1st Cir. 2021); *Lee v. City of Los Angeles*, 908 F.3d 1175, 1188 (9th Cir. 2018); *Hubbard*, 803 F.3d at 1315. The Subpoena in this case presents such a scenario.

The Subpoena solely seeks information relating to Speaker Vos' role as a legislator. Former President Trump is alleged to have called Speaker Vos after the Wisconsin Supreme Court's decision in *Teigen* not to discuss election law, but to secure Speaker Vos' agreement to rely on *Teigen* in taking state legislative action. Speaker Vos's own view about the scope of his state legislative authority—that is, his motivation or intent for failing to take state legislative action—is what he

communicated in response. Speaker Vos is immune from process whose sole aim is to force him to testify under penalty of perjury in some other place about this legislative request and the motivation for his refusal to act as Speaker. *In re Hubbard*, 803 F.3d at 1310. Accordingly, under the second prong of *Eastland*, Speaker Vos and the Wisconsin state legislature are not properly within the scope of the authorized investigation, and for this independent reason, the Speech or Debate Clause does not foreclose further inquiry into the validity of the Subpoena.

## C. The Subpoena imposes an undue burden on Speaker Vos

The fourth *Mazars* factor—burden—is not addressed above because it does not neatly align with either of *Eastland*'s two independent grounds for denying Congressional immunity. But, the burden factor too, weighs in the Speaker's favor. The *Mazars* court explained that "burdens imposed by a congressional subpoena should be carefully scrutinized, for they stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas for institutional advantage." *Id.* at 2035-2036. The same can easily be said for the rivalry between state legislatures and Congress. Of course, our Constitution makes clear under the Supremacy Clause that Congress is to prevail because its "laws" are the "supreme law of the land." U.S. Const. Art. VI, § 2. It cannot achieve its supremacy over state legislatures by non-legislative means, such as bullying or the heavy-handed use of its subpoena power (which is not enumerated in the constitution at all). Here, Speaker Vos was served on Saturday for a Monday morning deposition in the middle of a hard-fought election campaign. It would be an easy thing for the party

controlling Congress to violate Congressional rules to constitute a partisan Committee such as this one, and then subpoena public and private papers from the leadership of state legislatures controlled by the opposing party. Congress could cow or litigate them into submission by calling them to answer for their official conduct in the same way the Speech or Debate Clause prohibits for members of Congress. Thus, the Subpoena here seems to be precisely the kind of burden, imposed by one part of our constitutional system upon its rivals, that *Mazars* found important for purposes of deciding immunity.

For all of these reasons, the Court should find that the Speech or Debate Clause does not disarm state legislators who seek to rely on those very same legislative protections where Congress has become the aggressor. As shown below, this Court should reach the merits on each of Speaker Vos' three arguments, and order that the Subpoena cannot be enforced.

## III.   The Subpoena Cannot Be Enforced.

For three distinct reasons, the Subpoena should not be enforced. First, it does not seek testimony on matters within the bounds of the Committee's authorized investigation; second, it seeks to invade Speaker Vos' legislative immunity and privilege; and third, it was not issued in compliance with House rules meant to protect witness rights, because the Committee itself was not formed in compliance with its own authorizing resolution.

### a. The Subpoena does not seek testimony on matters within the bounds of the Committee's authorized investigation.

As shown above in Section II.a, the Subpoena seeks testimony on a request for legislative action allegedly made by former President Trump to the Speaker of the Wisconsin Assembly in July 2022, over eighteen months after January 6, 2021. That is outside of the investigative authority granted to this Committee, which was only authorized to investigate the events of January 6 itself, the causes that preceded it, and the impact the events of January 6 had on the peaceful transfer of power. See Exhibit B, Section 3(1). All of those events have long since transpired. The Committee is not a continuing inquisition into all people and things that happen to touch President Trump and elections. Congressional committees do not have general authority to issue subpoenas regarding any matter they desire. *Watkins*, 354 U.S. at 187. In this case, the Committee itself has made it clear that the Subpoena for Speaker Vos' deposition is well outside of the Committee's authorized investigation. The Court should issue a declaratory judgment deeming the unauthorized, unlawful, and unenforceable.

### b. The Subpoena is unenforceable because it seeks to violate Speaker Vos' legislative privilege.

As discussed above in Section II.b, the Committee seeks to violate Speaker Vos' legislative privilege through the Subpoena. Speaker Vos enjoys the protection of this longstanding legislative immunity and privilege under federal common law. *Tenney*, 341 U.S. at 372–376. This doctrine protects legislators from liability, defending against litigation, or being questioned elsewhere about actions concerning the

legislative process. A subpoena issued solely for the purpose of questioning legislators about these privileged matters is unenforceable. See *American Trucking Associations, Inc.* 14 F.4th at 90; *Lee*, 908 F.3d at 1188; *Hubbard*, 803 F.3d at 1315. Here, the Subpoena seeks to question Speaker Vos not only about President Trump's alleged July 2022 request for Wisconsin legislative action, but also about Speaker Vos' views about the legislature's failure to act. Compelling Speaker Vos to testify about these state legislative matters under penalties of perjury violates his legislative immunity and privilege, and for that independent reason, the Subpoena should not be enforced.

    **c. The Subpoena is unenforceable because the Committee's authorizing resolution was violated when the Committee was formed without a Ranking Member and the Subpoena and deposition were authorized in the absence of a Ranking Member.**

The Committee is not properly composed, and the Subpoena was not properly issued due to a material failure of Congress and the Committee to follow its own rules. Private citizens aggrieved by a material violation of House rules—as here—have a defense against compulsory process. *Yellin v. United States*, 374 U.S. 109, 114 (1963). Here, the Committee was not formed using Minority-proposed members and a Ranking Member as required by its authorizing resolution, and as a result of its defective, one-sided composition, it has consistently walked in lockstep in failing to follow House Rules, impinging on the rights of witnesses like Speaker Vos.

    **1. The Defendants failed to follow controlling rules.**

The Committee's authorizing resolution imposes simple, but important, requirements for formation of the Committee. First, the resolution requires the

Speaker of the House (Speaker) to appoint thirteen members to the Committee. Exhibit B, Section 2(a). Second, it requires the Speaker appoint at least five of those thirteen members after consultation with the Minority Leader. *Id*. The Speaker repudiated both of these requirements. First, the Speaker appointed just nine members to the Committee. See Exhibits C & D. Second, the Speaker refused to consult with the Minority Exhibit D. The Minority Leader provided the Speaker with five members of the minority party to appoint to the Committee. *Id*. The Speaker rejected these members and appointed all nine members on her own without input from the Minority Leader. *Id*. There is no Ranking Member. Dkt. 2, ¶ 14; See Exhibits C, D, & E. Thus, the Committee is small, streamlined, can be controlled by just five members of the majority, and contains no voice authorized by the minority party. All of its decisions—including the issuance of deposition subpoenas, the questioning of witnesses, the handling of privilege objections, and the release of transcripts—are under the complete and untempered control of the current majority through the Committee Chair alone.

The failure to follow rules governing the formation of a Congressional Committe has concrete effects, and makes it impossible for this Committee to comply with other rules that impose important procedural safeguards on its operations. For example, the rules of the Committee authorize the Chair to issue deposition subpoenas, but only *after consultation with the ranking member*. Exhibit B, Section 5(c)(6)(A); H. R. Res. 8 § 3(b)(1), 117th Cong. (2021) (Exhibit H). Yet because of the way in which it was formed, the Committee lacks a Ranking Member—a member

from the minority appointed upon consultation with the Minority Leader. Dkt. 2, ¶ 14; See Exhibits C, D, & E.

The Committee openly admits this: in place of a Ranking Member, it informally considers one of the two dissident minority members chosen by the Speaker as the Committee's "vice chair," a position that does not exist and that has no rights or responsibilities under the House Rules. See Exhibit E. Because there is no Ranking Member, the Chair did not consult with the ranking member, as required by resolution, prior to issuing Speaker Vos' Subpoena.

In the absence of a minority and a Ranking Member, Speaker Vos has been, and will be, deprived of the protection of other applicable rules and protections in the House deposition regulations. This includes at least the following:

1. Regulation 2, providing that the Ranking Member and other Committee members receive at least three business days' written notice before a deposition, except in "exigent circumstances." See Exhibit F (Regulations for the Use of Deposition Authority for the 117th Congress, applicable to the Select Committee under H.R. Res. 8, § 3(b)(2), 117th Cong. (2021)). The House has already violated this Regulation by issuing a subpoena on a Friday, and serving Speaker Vos on Saturday, for a Monday morning deposition.

2. Regulations 5 and 6, providing that only two counsel shall question the witness at deposition, one appointed by the Chair and one by the Ranking Member, and that they shall proceed in rounds, with each counsel having equal time. *Id*. Here, only Chair-appointed counsel question the witness, removing an important protection for witnesses. *Id*. Further, past experience shows that the Committee frequently uses three or more Chair-appointed counsel to "tag-team" witnesses from the majority's perspective, without break.

3. Regulation 7, which allows witnesses to make objections based on privilege, but vests the right of appeal of the Chair's decision to the full Committee only in another "member." *Id*. Here, there are no minority-proposed appointees on the Committee at all, and so witnesses like Speaker Vos are subject to a contempt finding without any meaningful input.

4. Regulation 10, which provides that the Chair "shall consult" with the Ranking Member prior to releasing transcripts. *Id*. Here, if privileged material is required to be disclosed at deposition on penalty of contempt, there will be no Ranking Member to advocate against public disclosure of the privileged material pending a resolution in some other tribunal.

In short, the initial failure to properly form and constitute the Committee is not some technical misstep; it strips witnesses of the rights and protections attendant to having true minority representation and a Ranking Member on the Committee. As shown below, this violates—and threatens to violate—Speaker Vos' rights, and justifies judicial intervention.

> ## 2. Speaker Vos' rights were violated, and will be violated, because of Defendants' failure to follow controlling rules.

The violation of Speaker Vos' rights here are at least as serious as those recognized under *Yellin*, which established that private citizens aggrieved by a material violation of House rules have a defense against compulsory process. *Yellin*, 374 U.S. at 114. There, the House Un-American Affairs Committee had failed to follow Rule IV, which required the committee to weigh certain considerations and act upon the express request of Yellin, the witness, to proceed in executive session because he believed his public testimony would harm his reputation. Because the committee had not followed Rule IV, the Supreme Court held that Yellin could not be convicted for contempt of Congress for failing to answer questions about his political affiliation and activities. *Id*. It was not necessary to the Court's decision that the committee would or should have granted Yellin's request for private, executive session testimony; the holding rests upon the committee's failure to actually apply

Rule IV in considering his request. As *Yellin* shows, then, the House's failure to follow a rule is justiciable when raised by a witness subject to compulsory process, and it is particularly significant where a person's constitutional rights are involved.

Here, fundamental rights have already been violated: Speaker Vos was deprived of meaningful notice and was subjected to an infringement of his legislative immunity from civil service. Importantly for purposes of *Yellin*, that violation of rights resulted from a Committee that was not composed of members actually proposed by the Minority Leader, and that therefore lacked a Ranking Member. Although the minority never, of course, controls a committee, the discussion in subpart (1), *supra*, shows that a committee with a real minority and a Ranking Member provides important protections that allow witnesses to assert their constitutional rights and privileges, from the decision about whether and how to subpoena a deponent, to the questioning itself, through the process for raising privileges and having them ruled upon, to the question of disclosure of the transcript. The unipolar partisan composition of this Committee, in contrast, has allowed it to act in violation of its own Rules, without notice, deliberation, or basic regard for the rights of witnesses.

Thus, for example, Speaker Vos was served on a Saturday afternoon for a first-thing-Monday-morning deposition. Exhibit G. This violated the House's rule providing that the Ranking Member and other Committee members receive at least three business days' written notice before a deposition, except in "exigent circumstances." See Exhibit F. Where a Committee moves in lockstep without input

from the minority, it can freely disregard its own rules and violate the rights of witnesses. Speaker Vos can expect similar treatment when it comes to questioning by multiple counsel without any attorney representing House Minority Leader appointees present, asserting constitutionally-based privileges, and objecting to leaks or formal disclosure of transcript sections for which he has asserted an objection.

These are not accidental errors or procedural niceties that were overlooked in the crush of events. Instead, these flaws are deliberately baked in to a Committee that was never intended to comply with its own authorizing resolution by having true minority representation or a Ranking Member. Because the Committee is improperly constituted and the Subpoena was not issued in compliance with the controlling Rules, the Court should declare that the Subpoena is unenforceable.

## Conclusion

For these reasons, Speaker Vos respectfully requests this Court enter a declaratory judgment that the Subpoena is unlawful and unenforceable.

Dated: October 4, 2022                               Respectfully submitted,

**GRAVES GARRETT, LLC**

*/s/ Edward D. Greim*_____
Edward D. Greim (Mo. Bar #54034)*
Paul Brothers (Mo. Bar # 68704)*
1100 Main Street, Suite 2700
Kansas City, MO 64105
Phone: (816) 256-3181
edgreim@gravesgarrett.com
pbrothers@gravesgarrett.com

**CRAMER, MULTHAUF & HAMMES, LLP**

*/s/ Matthew M. Fernholz*
Matthew M. Fernholz (Wis. Bar # 1065765)
Ashley E. McNulty (Wis. Bar # 1107355)
1601 E. Racine Ave., Suite 200
Waukesha, WI 53186
Phone: (262) 542-4278
mmf@cmhlaw.com
aem@cmhlaw.com


**LAWFAIR LLC**
*/s/ Adam K. Mortara*
Adam K. Mortara (Wis. Bar No. 1038391)
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
Phone: (773) 750-7154
mortara@lawfairllc.com


*Counsel for Plaintiff*