**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| ROBIN VOS,<br><br>     *Plaintiff*,<br><br>  v.<br><br>U.S. HOUSE SELECT COMMITTEE TO INVESTIGATE THE JANURARY 6TH ATTACK ON THE UNITED STATES CAPITOL, *et al.*,<br><br>     *Defendants*. | Case No. 2:22-CV-01119-PP |

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DECLARATORY JUDGMENT, AND DEFENDANTS' MOTION TO DISMISS

Defendants the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol and the Honorable Bennie G. Thompson respectfully submit this opposition to Plaintiff Robin Vos's Motion for a Preliminary Injunction and Declaratory Judgment (Oct. 4, 2022) (ECF 17), and move for an order dismissing Plaintiff's Complaint (Sept. 25, 2022) (ECF 1). For the reasons set forth in the accompanying Memorandum of Law, Speaker Vos's Motion should be denied and the Complaint should be dismissed with prejudice.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter
 *General Counsel*
Todd B. Tatelman
 *Principal Deputy General Counsel*
Eric S. Columbus
 *Special Litigation Counsel*

Office of General Counsel[*]
U.S. House of Representatives
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

*Counsel for Defendants*

October 11, 2022

---

[*] Attorneys for the Office of General Counsel for the U.S. House of Representatives are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court." 2 U.S.C. § 5571(a).

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| ROBIN VOS, | |
| *Plaintiff,* | |
| v. | Case No. 2:22-CV-01119-PP |
| U.S. HOUSE SELECT COMMITTEE TO INVESTIGATE THE JANURARY 6TH ATTACK ON THE UNITED STATES CAPITOL, *et al.,* | |
| *Defendants.* | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DECLARATORY JUDGMENT, AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 2

ARGUMENT .............................................................................................................................. 6

I.      LEGAL STANDARD ..................................................................................................... 7

II.     SPEAKER VOS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON
THE MERITS ................................................................................................................. 7

III.    SPEAKER VOS HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF
IRREPARABLE HARM .............................................................................................. 29

IV.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY
IN FAVOR OF THE SELECT COMMITTEE .......................................................... 29

CONCLUSION ....................................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ansara v. Eastland,*
442 F.2d 751 (D.C. Cir. 1971) ........................................................................................... 15

*Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff,*
No. 20-cv-106 (D.D.C. July 31, 2020) ................................................................................ 14

*Barenblatt v. United States,*
360 U.S. 109 (1959) .............................................................................................. 15, 30

*Barker v. Conroy,*
921 F.3d 1118 (D.C. Cir. 2019) .............................................................................. 20, 27

*Barr v. Matteo,*
360 U.S. 564 (1959) .......................................................................................................... 9

*Barry v. U.S. ex rel. Cunningham,*
279 U.S. 597 (1929) ........................................................................................................ 21

*Brown & Williamson Tobacco Corp. v. Williams,*
62 F.3d 408 (D.C. Cir. 1995) ........................................................................................... 11

*Budowich v. Pelosi,*
No. 21-cv-03366 (D.D.C. Jan. 20, 2022) ................................................................ 17, 26, 27

*Comm. on the Judiciary of U.S. House of Representatives v. McGahn,*
968 F.3d 755 (D.C. Cir. 2020) ......................................................................................... 29

*Doe v. McMillan,*
412 U.S. 306 (1973) ................................................................................................... 9, 10

*Dombrowski v. Eastland,*
387 U.S. 82 (1967) ............................................................................................................ 8

*E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.,*
414 F.3d 700 (7th Cir. 2005) ........................................................................................... 29

*Eastland v. U.S. Servicemen's Fund,*
421 U.S. 491 (1975) .................................................................... 8, 9, 10, 11, 12, 13

*Eastman v. Thompson,*
No. 22-cv-99 (C.D. Cal.) .......................................................... 17, 18, 19, 23, 26

iii

*Exxon Corp. v. F.T.C.*,
  589 F.2d 582 (D.C. Cir. 1978) ................................................................................................ 28, 29

*Gravel v. United States*,
  408 U.S. 606 (1972) ...................................................................................................................... 8, 9

*GEFT Outdoors, LLC v. City of Westfield*,
  922 F.3d 357 (7th Cir. 2019) ........................................................................................................... 7

*Helstoski v. Meanor*,
  442 U.S. 500 (1979) .......................................................................................................................... 9

*Howard v. Off. of the Chief Admin. Officer*,
  720 F.3d 939 (D.C. Cir. 2013) .......................................................................................................... 8

*Jud. Watch, Inc. v. Schiff*,
  474 F. Supp. 3d 305 (D.D.C. 2020) ................................................................................................ 14

*Kilbourn v. Thompson*,
  103 U.S. 168 (1880) .......................................................................................................................... 9

*Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*,
  440 U.S. 391 (1979) ........................................................................................................................ 16

*McCarthy v. Pelosi*,
  5 F.4th 34 (D.C. Cir. 2021) .............................................................................................................. 9

*McGrain v. Daugherty*,
  273 U.S. 135 (1927) ........................................................................................................................ 30

*Miller v. Transam. Press, Inc.*,
  709 F.2d 524 (9th Cir. 1983) .......................................................................................................... 11

*MINPECO, S.A. v. Conticommodity Servs., Inc.*,
  844 F.2d 856 (D.C. Cir. 1988) ........................................................................................................ 11

*Pursuing Am.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ........................................................................................................ 29

*Rangel v. Boehner*,
  20 F. Supp. 3d 148 (D.D.C. 2013) .................................................................................................. 20

  785 F.3d 19 (D.C. Cir. 2015) .......................................................................................................... 10

*Republican Nat'l Comm. v. Pelosi ("RNC")*,
  — F. Supp. 3d —, 2022 WL 1294509 (D.D.C. May 1, 2022) ................................................. 17, 25

*Schilling v. Pelosi*,
  No. 22-cv-162 (D.D.C. Oct. 3, 2022) .............................................................................................. 16

iv

*Tenney v. Brandhove,*
  341 U.S. 367 (1951) ................................................................................................................ 12

*Teigen v. Wis. Elections Comm'n,*
  976 N.W.2d 519 (Wis. 2022) .................................................................................................... 2

*Tranchita v. Callahan,*
  511 F. Supp. 3d 850 (N.D. Ill. 2021) ...................................................................................... 29

*Trump v. Mazars USA, LLP,*
  140 S. Ct. 2019 (2020) ........................................................................................................7, 14

*Trump v. Thompson,*
  20 F.4th 10 (D.C. Cir. 2021) .......................................................................................... 1, 4, 17

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC,*
  933 F.3d 728 (D.C. Cir. 2019) ................................................................................................. 23

*United States v. Biaggi,*
  853 F.2d 89 (2d Cir. 1988) ................................................................................................ 12, 13

*United States v. Brewster,*
  408 U.S. 501 (1972) ............................................................................................................8, 10

*United States v. Chem. Found., Inc.,*
  272 U.S. 1 (1926) ..................................................................................................................... 21

*United States v. Dowdy,*
  479 F.2d 213 (4th Cir. 1973) ................................................................................................... 13

*United States v. Helstoski,*
  442 U.S. 477 (1979) ................................................................................................................... 8

*United States v. Johnson,*
  383 U.S. 169 (1966) ........................................................................................................8, 9, 10

*United States v. Locke,*
  529 U.S. 89 (2000) ................................................................................................................... 16

*United States v. Rostenkowski,*
  59 F.3d 1291 (D.C. Cir. 1995) .......................................................................................... 20, 25

*United States v. Rumely,*
  345 U.S. 41 (1952) ................................................................................................................... 15

*United States v. Tobin,*
  306 F.2d 270 (D.C. Cir. 1962) ................................................................................................. 15

Case 2:22-cv-01119-PP   Filed 10/11/22   Page 7 of 41   Document 21

*United States v. U.S. House of Reps.,*
    556 F. Supp. 150 (D.D.C. 1983) ................................................................ 15, 16

*Vander Jagt v. O'Neill,*
    699 F.2d 1166 (D.C. Cir. 1982) .................................................................. 21, 27

*Ward v. Thompson,*
    No. 22-cv-08015 (D. Ariz. 2022) ............................................................... 17, 27

*Wheaton v. Peters,*
    33 U.S. (8 Pet.) 591 (1834) .............................................................................. 17

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................................ 7, 29

**Statutes**

26 U.S.C. §§ 8001-05 ............................................................................................... 21

**Constitution**

U.S. Const., Art. I, § 5, cl. 2 .................................................................................. 20

U.S. Const., Art. I, § 6, cl. 1 .................................................................................... 8

U.S. Const., Art. VI, cl. 2 ....................................................................................... 16

U.S. Const., Amend. XX, § 1 .................................................................................. 6

**Legislative Sources**

8 *Cannon's Precedents of the U.S. House of Representatives* § 2172 (1936) ..................... 22

165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) ................................................. 21

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) ....................................................... 22

167 Cong. Rec. H3597 (daily ed. July 1, 2021) ..................................................... 4

167 Cong. Rec. H3885 (daily ed. July 26, 2021) .................................................. 5

167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) ................................................ 25

167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) ........................................... 26

167 Cong. Rec. H7786 (daily ed. Dec. 14, 2021) ............................................... 25

Case 2:22-cv-01119-PP   Filed 10/11/22   Page 8 of 41   Document 21

167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ........................................................25

167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) ..................................................26

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) ..........................................................25

168 Cong. Rec. H4379 (daily ed. Apr. 6, 2022) ..........................................................26

H.R. 8873, 117th Cong. (2022) ....................................................................................18

H. Rep. No. 109-377 (2006) .........................................................................................22

H. Res. 6, 116th Cong. (2019) ......................................................................................23

H. Res. 10, 117th Cong. (2021) ....................................................................................24

H. Res. 437, 109th Cong. (2005) ..................................................................................22

H. Res. 503, 117th Cong. (2021) ....................................... 3, 4, 12, 21, 22, 23, 24, 25

H. Res. 730, 117th Cong. (2021) ..................................................................................26

H. Res. 851, 117th Cong. (2021) ..................................................................................26

H. Res. 1037, 117th Cong. (2022) ................................................................................26

Rules of the U.S. House of Representatives, 117th Cong. (2021)

    Rule I ........................................................................................................................22

    Rule X .......................................................................................................................21

    Rule XI ......................................................................................................................27

S. 4573, 117th Cong. (2022) .........................................................................................18

**Other Sources**

Donald J. Trump, Truth Social (July 19, 2022, 7:11 p.m.),
    https://perma.cc/4TG4-UU6E .............................................................................3

Donald J. Trump, Truth Social (July 19, 2022, 10:01 p.m.),
    https://perma.cc/W6Z7-JGJ8.............................................................................19

Donald J. Trump, Truth Social (Aug. 29, 2022, 8:39 a.m.),
    https://perma.cc/9ZXL-4C9D ............................................................................20

June 9, 2022 Select Comm. Hr'g, 117th Cong. (2022),
https://perma.cc/P3GC-A88L ................................................................................18

June 16, 2022 Select Comm. Hr'g, 117th Cong. (2022),
https://perma.cc/GKY6-7N82 ...............................................................................19

June 21, 2022 Select Comm. Hr'g, 117th Cong. (2022),
https://perma.cc/TJY4-U33 ............................................................................. 18, 19

June 23, 2022 Select Comm. Hr'g, 117th Cong. (2022),
https://perma.cc/FPM7-AUEK ..............................................................................18

Matt Smith, *'UPFRONT' recap: Trump calls Vos in attempt to overturn 2020 presidential results,*
WISN (July 24, 2022), https://perma.cc/M44B-WTNK .................................................3

Matt Smith, *Vos says former President Trump called him last week in another push to decertify 2020*
*presidential results,* WISN (July 19, 2022), https://perma.cc/G52D-DN7C....................................2

Press Release, Kevin McCarthy, H. Republican Leader, McCarthy Statement about Pelosi's
Abuse of Power on Jan. 6th Select Comm. (July 21, 2021),
https://perma.cc/87VC-MZXF .................................................................................5

Press Release, Kevin McCarthy, McCarthy Names House Republicans to Serve on Select
Committees (July 19, 2021), https://perma.cc/W3JD-8QED .......................................5

Press Release, Nancy Pelosi, Speaker, H.R., Pelosi Statement on Republican Recommendations
to Serve on the Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol
(July 21, 2021), https://perma.cc/LE63-8CW6 ........................................................5

Reid J. Epstein, *A Top Wisconsin Republican Fires the 2020 Election Investigator He Hired,*
N.Y. Times (Aug. 12, 2022), https://perma.cc/N9V4-RLYL.......................................3

Sean Golonka & Carly Sauvageau, *Trump decries Nevada gas prices, boosts Laxalt,*
*Lombardo and GOP ticket,* Nev. Indep. (Oct. 8, 2022), https://perma.cc/H4HG-YFYG ..........19

Statement by Donald J. Trump, 45th President of the United States of America,
Jan. 30, 2022, https://perma.cc/Q6WM-F77U ........................................................19

Ted Johnson, *Donald Trump Goes on Social Media Tear with Conspiracy Theories, False Election Claims*
*Amid Mar-a-Lago Document Investigation,* The Deadline (Aug. 30, 2022),
https://perma.cc/N3KW-8R94 ......................................................................... 19, 20

*Trump in Arizona: Former president ends speech saying U.S. is 'nation in decline,'* Azcentral. (Oct. 10, 2022),
https://perma.cc/HQ4B-2DBJ .................................................................................19

# INTRODUCTION

Plaintiff Robin Vos, Speaker of the Wisconsin Assembly, asks this Court to preliminarily enjoin the enforcement of a subpoena for deposition testimony issued to him by the United States House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee"). *See* ECF 17. Speaker Vos provides no valid basis for this Court to thwart a Congressional committee's investigation into "the single most deadly attack on the Capitol by domestic forces" and evaluation of the need for legislation to "ensur[e] the safe and uninterrupted conduct of [Congress's] constitutionally assigned business." *Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021), *inj. denied*, 142 S. Ct. 680 (2022), *cert. denied*, 142 S. Ct. 1350 (2022).

The Select Committee is investigating the facts, circumstances, and causes regarding the January 6th attack on the United States Capitol. This includes an examination of the influencing factors that fomented the attack on the United States Capitol, as well as efforts to undermine the peaceful transfer of power, before, during, and in the aftermath of the events of January 6, 2021.

The Select Committee has gathered information suggesting that Speaker Vos has, on multiple occasions, engaged directly with President Trump regarding Trump's attempts to alter the results of the 2020 Presidential election in Wisconsin. Speaker Vos's testimony is plainly important to the Select Committee's investigation into efforts to undermine the peaceful transfer of power following the 2020 Presidential election.

This lawsuit and the injunctive relief Speaker Vos seeks against a Congressional committee are squarely foreclosed by the Constitution's Speech or Debate Clause. In any event, even if this Court had jurisdiction here, Speaker Vos has failed to show that he is likely to succeed on the merits of his claims; indeed, all of the claims in his Motion fail as a matter of law. On top of that, he has failed to show that he would suffer irreparable injury absent an injunction, and the public interest heavily favors the Select Committee's weighty investigation. The Court should thus deny Speaker

1

Vos's request for injunctive relief and should dismiss his Complaint.

## FACTUAL BACKGROUND

### A. Speaker Vos Has Had Repeated Communications With Former President Trump Regarding Overturning The 2020 Presidential Election

In late July 2022, Speaker Vos publicly disclosed that former President Trump had called him in an unsuccessful attempt to convince him to have the Wisconsin state legislature somehow reverse the outcome of the 2020 Presidential election results in Wisconsin.[1]  A few weeks before this call, the Wisconsin Supreme Court had decided *Teigen v. Wis. Elections Comm'n*, 976 N.W.2d 519 (Wis. 2022), which limits the use of ballot drop boxes in future elections.  Although *Teigen* applies only prospectively, and although the 2020 election had taken place nearly twenty months prior, public reporting indicates that former President Trump asked Speaker Vos to somehow overturn the result of the 2020 presidential race, presumably through the Wisconsin legislature.[2]  According to Speaker Vos, President Trump "ma[de] his case" and "would like us to do something different in Wisconsin."[3]  Speaker Vos reportedly declined former President Trump's request and informed him that altering the 2020 election results would violate Wisconsin's state constitution.[4]

A few days later, on the social media site Truth Social, former President Trump asserted that Speaker Vos would struggle against a primary challenger if he did not take action to have the election results decertified, stating:

> So what's Speaker Robin Vos doing on the Great Wisconsin Supreme Court Ruling declaring hundreds of thousands of Drop Box votes to be illegal?  This is not a time for him to hide, but a time to act!  I don't know his opponent in the upcoming Primary, but feel certain he will do well if Speaker Vos doesn't move with gusto.  Robin, don't

---

[1]  *See* Matt Smith, *Vos says former President Trump called him last week in another push to decertify 2020 presidential results*, WISN (July 19, 2022), https://perma.cc/G52D-DN7C.

[2]  *See id.*

[3]  *See id.*

[4]  *See id.*

let the voters of Wisconsin down![5]

This was not the only recent conversation between Speaker Vos and the former President. In a recent interview, Speaker Vos stated: "You know, I have talked to President Trump, I don't even know how many times, over the course of this six months."[6] When asked about the substance of these conversations, Speaker Vos responded only that Mr. Trump had been "very consistent."[7]

These conversations are not the only examples of Speaker Vos's entanglement in President Trump's campaign to decertify the 2020 Presidential election results. In June 2021, reportedly under pressure from the former President, Speaker Vos hired a former Wisconsin Supreme Court Justice to "audit" the state's 2020 election results.[8] The subsequent 14-month investigation turned up no significant evidence of fraud, cost the state over $1 million, and concluded when Speaker Vos fired the man he had put in its charge, calling him "an embarrassment to the state."[9]

## B.    The January 6th Attack

The tragedy that occurred at the U.S. Capitol on January 6, 2021 is now well known. Violent rioters seeking to stop the peaceful transfer of power following the 2020 Presidential election launched a vicious assault on the United States Capitol. *See* H. Res. 503, 117th Cong. Preamble (2021).[10] Rioters attacked police, breached the Capitol, and obstructed and impeded the Constitutionally mandated electoral count. As the D.C. Circuit has described, "[t]he rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to

---

[5]  Donald J. Trump, Truth Social (July 19, 2022, 7:11 p.m.), https://perma.cc/4TG4-UU6E.

[6]  Matt Smith, '*UPFRONT' recap: Trump calls Vos in attempt to overturn 2020 presidential results,* WISN (July 24, 2022), https://perma.cc/M44B-WTNK.

[7]  *See id.*

[8]  Reid J. Epstein, *A Top Wisconsin Republican Fires the 2020 Election Investigator He Hired*, N.Y. Times (Aug. 12, 2022), https://perma.cc/N9V4-RLYL.

[9]  *See id.*

[10]  A copy of H. Res. 503 is included in the record at ECF 18-2.

3

the Capitol." *Trump v. Thompson*, 20 F.4th at 15.

### C. The Formation Of The Select Committee

In response to this unprecedented attack, the United States House of Representatives adopted House Resolution 503, "establish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol." H. Res. 503 § 1. This Resolution directs the Select Committee to investigate and report on "the interference with the peaceful transfer of power[.]" *Id.* § 3(1). House Resolution 503 also specifically authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures ... as it may deem necessary." *Id.* § 4(a)(1)-(3). The resolution further describes categories of potential corrective measures: "changes in law, policy, procedure, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism." *Id.* § 4(c).

To carry out those important functions, House Resolution 503 authorizes the Speaker of the U.S. House to appoint up to thirteen Members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader." *Id.* § 2(a). Consistent with the Resolution, the Speaker initially appointed eight Members of the House (seven Democrats and one Republican) to the Select Committee. *See* 167 Cong. Rec. H3597 (daily ed. July 1, 2021). She then consulted

with the House Minority Leader, who recommended five Republicans for appointment.[11]  When the Speaker voiced concerns about two of those Members "and the impact their appointments may have on the integrity of the [Select Committee's] investigation," the Minority Leader declined to recommend additional Republicans for appointment and, instead, withdrew all five recommendations.[12]  The Speaker then named an additional Republican to the Select Committee.  *See* 167 Cong. Rec. H3885 (daily ed. July 26, 2021).  Since then, the Select Committee has functioned with seven Democrats and two Republicans.  The Select Committee's authorization expires at the conclusion of the 117th Congress, January 3, 2023.

### D.    The Select Committee's Subpoena To Speaker Vos

In furtherance of its duty to investigate the facts, circumstances, and causes of the January 6th attack, the Select Committee has issued subpoenas to various government agencies, state government officials, private companies, and certain private individuals.

Specifically with respect to Speaker Vos, on September 6, 2022, Select Committee staff contacted the Speaker's Assembly office to determine whether he would be willing to speak with the Select Committee regarding matters related to its investigation.  Beginning on September 16, Select Committee staff engaged in a series of discussions with Speaker Vos's personal counsel regarding the request for an interview and its potential scope.

When these negotiations failed to produce a voluntary agreement, the Select Committee

---

[11]  Press Release, Kevin McCarthy, McCarthy Names House Republicans to Serve on Select Committees (July 19, 2021), https://perma.cc/W3JD-8QED.

[12]  Press Release, Nancy Pelosi, Speaker, H.R., Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/LE63-8CW6; *see* Press Release, Kevin McCarthy, H. Republican Leader, McCarthy Statement about Pelosi's Abuse of Power on Jan. 6th Select Comm. (July 21, 2021), https://perma.cc/87VC-MZXF.

issued a subpoena to Speaker Vos on Friday, September 23, seeking deposition testimony on Monday, September 26. *See* ECF 18-7. The Select Committee has continued to engage Speaker Vos's counsel regarding both the timing and parameters of Speaker Vos's testimony, which the Select Committee is willing to narrowly focus on his interactions with former President Trump regarding overturning the results of the 2020 Presidential election.

### E. Procedural History

On Sunday, September 25, Speaker Vos filed the Complaint here. *See* ECF 1. Speaker Vos requested a temporary restraining order prohibiting the Select Committee from enforcing its subpoena, a declaration that the subpoena is invalid and unenforceable, and a permanent injunction quashing the subpoena. *See id.* Given the filing of the suit, the Select Committee elected to postpone the deposition and so informed Speaker Vos's counsel. *See* ECF 17 at 6.

Subsequently, the parties stipulated to an expedited briefing schedule on a combined preliminary injunction motion and trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). *See* ECF 14. The Court accepted the parties' stipulation and entered an order establishing the agreed-upon briefing schedule. *See* ECF 15.

While the subpoena to Speaker Vos remains legally operative and enforceable, the Select Committee has not yet rescheduled his deposition to a particular date. The current Congress expires on January 3, 2023. *See* U.S. Const., Amend. XX, § 1.

## ARGUMENT

Speaker Vos has failed to show that he is entitled to the highly extraordinary remedy of a preliminary injunction issued against a Congressional committee investigating an attack on the United States Congress. *First*, the Speech or Debate Clause absolutely bars Speaker Vos's suit against the Select Committee and prevents him from obtaining the injunctive relief he seeks. If this Court accepts this argument (grounded in clear Constitutional text and Supreme Court precedent), it

need go no further.  *Second*, the Supreme Court's recent opinion in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), is inapposite and does not provide a basis for jurisdiction, let alone the proper framework for analyzing this subpoena.  *Third*, there is no basis for this Court to issue a preliminary injunction simply because the dispute implicates the separation of powers or federalism.  *Fourth*, the Select Committee has a valid legislative purpose to subpoena Speaker Vos's testimony regarding continued efforts to overturn the 2020 Presidential election.  *Fifth*, as other federal courts have held (with no court coming out the other way), the Select Committee is validly constituted.  *Finally*, Speaker Vos has not shown that he will suffer irreparable harm in the absence of an injunction, and the equities and public interest weigh heavily against judicial interference with the Select Committee's critical investigation.

Speaker Vos's Motion for a Preliminary Injunction should therefore be denied, and this suit should be dismissed.

## I.       LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To obtain this extraordinary remedy, a plaintiff must show: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *See id.* at 20. Failure to meet any of these threshold requirements requires denial of the preliminary injunction. *See, e.g.*, *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

## II.      SPEAKER VOS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.       The Speech Or Debate Clause Bars Speaker Vos's Suit And Requested Relief

Speaker Vos cannot establish a likelihood of success because long-established Supreme Court precedent demonstrates that this lawsuit is absolutely barred by the Speech or Debate Clause.

7

The Speech or Debate Clause mandates that Senators and Representatives "shall not be questioned in any other Place" for "any Speech or Debate in either House." U.S. Const., Art. I, § 6, cl. 1. By "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel v. United States*, 408 U.S. 606, 618 (1972), the Clause both "preserve[s] the independence and ... integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972), and "reinforc[es] the separation of powers," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975).

The absolute immunity afforded by the Speech or Debate Clause extends to *all* civil actions. *See id.* at 503. It protects federal legislators "not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967). The D.C. Circuit, for example, has specifically held that when a suit is predicated on legislative actions, "[t]he Speech or Debate Clause operates as a jurisdictional bar." *Howard v. Off. of the Chief Admin. Officer*, 720 F.3d 939, 941 (D.C. Cir. 2013) (quotation marks omitted).

"The purpose of the [Speech or Debate] Clause is to insure that the legislative function the Constitution allocates to Congress may be performed *independently* .... [T]he central role of the Clause is to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Eastland*, 421 U.S. at 502 (emphasis added and internal quotation marks omitted); *see also United States v. Helstoski*, 442 U.S. 477, 491 (1979) ("This Court has reiterated the central importance of the Clause for preventing intrusion by [the] Executive and Judiciary into the legislative sphere."). "In the American governmental structure the [C]lause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." *United States v. Johnson*, 383 U.S. 169, 178 (1966).

Because "the guarantees of th[e Speech or Debate] Clause are vitally important to our system of government," they "are entitled to be treated by the courts with the sensitivity that such

important values require." *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979). Accordingly, the Supreme Court has repeatedly, and "[w]ithout exception, … read the Speech or Debate Clause broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501; *see also Doe v. McMillan*, 412 U.S. 306, 311 (1973); *Gravel*, 408 U.S. at 617-18; *Johnson*, 383 U.S. at 179; *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880).

The Speech or Debate Clause provides, *inter alia*, immunity from prosecutions or civil lawsuits with respect to any and all actions "within the 'legislative sphere.'" *McMillan*, 412 U.S. at 312-13 (quoting *Gravel*, 408 U.S. at 624-25). The Supreme Court has stated unequivocally that when the challenged "actions of the [Select Committee] fall within the sphere of legitimate legislative activity," they "shall not be questioned in any other Place about those activities since the prohibitions of the Speech or Debate Clause are absolute." *Eastland*, 421 U.S. at 501 (internal quotation marks omitted); *see also id.* at 503, 509 n.16, 509-10; *Gravel*, 408 U.S. at 623 n.14; *Barr v. Matteo*, 360 U.S. 564, 569 (1959).

**B.     The Issuance Of A Congressional Subpoena Is A "Legislative Act" Within The Scope Of The Speech Or Debate Clause**

Activities "within the 'legislative sphere,'" *McMillan*, 412 U.S. at 312 (quoting *Gravel*, 408 U.S. at 624-25), include all activities that are

> an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Gravel*, 408 U.S. at 625; *accord Eastland*, 421 U.S. at 504.

The concept of "legislative activity" has been broadly construed to include much more than merely words spoken in debate. The "cases have plainly not taken a literalistic approach in applying the privilege. … Committee reports, resolutions, and the act of voting are equally covered[.]" *Gravel*, 408 U.S. at 617. The "key consideration, Supreme Court decisions teach, is the act presented for examination, not the actor." *McCarthy v. Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct.

897 (2022) (internal quotation marks omitted).

Of particular relevance here, the Supreme Court has unambiguously held that the "power to investigate and to do so through compulsory process" is activity within the legislative sphere. *Eastland*, 421 U.S. at 504. This is so because "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Id.* (internal quotation marks omitted).

Thus, "[i]ssuance of subpoenas such as the one in question here has long been held to be a legitimate use by Congress of its power to investigate." *Eastland*, 421 U.S. at 504. Moreover, "[i]t also has been held that the subpoena power may be exercised by a committee acting, as here, on behalf of one of the Houses." *Id.* at 505. Accordingly, a committee's "issuance of a subpoena pursuant to an authorized investigation is ... an indispensable ingredient of lawmaking," *id.*, and the Speech or Debate Clause therefore precludes litigation challenges to such subpoenas. *See id.* at 507 (Committee "Members are immune because the issuance of the subpoena is essential to legislating") (internal quotation marks omitted).

The Clause also bars any "inquiry ... into ... the motivation for [legislative] acts." *Brewster*, 408 U.S. at 512; *see also Johnson*, 383 U.S. at 180, 184-85 (such inquiry "necessarily contravenes the ... Clause"). Thus, the Clause is not abrogated by allegations that a Legislative Branch official acted unlawfully or with an unworthy purpose. *See, e.g.*, *McMillan*, 412 U.S. at 312-13 (Clause applies to all legislative activities "even though [the] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes"); *Rangel v. Boehner*, 785 F.3d 19, 24 (D.C. Cir. 2015) ("[a]n act does not lose its legislative character simply because a plaintiff alleges that it violated the House Rules ... or even the Constitution ... Such is the nature of absolute immunity, which is—in a word—absolute." (internal citations omitted)).

Finally, courts have consistently held that once the "legislative process" test is met, that is

"the end of the matter." *See, e.g.*, *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 861 (D.C. Cir. 1988); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418-19 (D.C. Cir. 1995) ("Once the legislative-act test is met, … the privilege is absolute." (quoting *Miller v. Transam. Press, Inc.*, 709 F.2d 524, 529 (9th Cir. 1983))).

### C. The Subpoena To Speaker Vos Is Absolutely Protected By The Clause

Speaker Vos's Complaint and Motion are thus squarely foreclosed by binding Supreme Court precedent, specifically *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975). *Eastland* involved an investigation of various activities of the United States' Serviceman's Fund, Inc. ("USSF") to determine whether they were potentially harmful to the morale of the U.S. Armed Forces. *See id.* at 493. As a part of the investigation, a Congressional committee issued a subpoena to USSF's bank seeking all records involving its accounts. *See id.* at 494. USSF and two of its members brought an action against the Chairman, Members, and Chief Counsel of the committee to enjoin implementation of the subpoena on First Amendment grounds. *See id.* at 495. The Supreme Court squarely rejected the notion that a Congressional subpoena could be judicially quashed. *See id.* at 512.

In determining that issuance of a Congressional subpoena is a legislative act and, therefore, absolutely privileged under the Speech or Debate Clause, the *Eastland* Court explained that "the power to investigate is inherent in the power to make laws" and "[i]ssuance of subpoenas ... [is] a legitimate use by Congress of its power to investigate." *Id.* at 504 (citation omitted). Accordingly, the Court concluded that "the Speech or Debate Clause provides complete immunity for the Members for issuance of this subpoena." *Id.* at 507.

*Eastland* also confirms the exceedingly limited role of the judiciary in determining whether a Congressional committee's issuance of a subpoena involves legislative matters protected by the Speech or Debate Clause. "The courts should not go beyond the narrow confines of determining

that a committee's inquiry may fairly be deemed within its province." *Id.* at 506 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951)); *see also United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988). The *Eastland* Court made clear that the only permissible judicial inquiry was a deferential assessment of whether "the investigation upon which the [Committee] had embarked concerned a subject on which 'legislation could be had.'" 421 U.S. at 506 (citation omitted). Finally, *Eastland* "illustrates vividly the harm that judicial interference may cause." *Id.* at 511. The Speech or Debate Clause "was written to prevent the need to be confronted by such 'questioning' and to forbid invocation of judicial power to challenge the wisdom of Congress' use of its investigative authority." *Id.*

Here, there can be no question that the subpoena to Speaker Vos was issued in furtherance of the Select Committee's investigation concerning "a subject on which 'legislation could be had.'" *Id.* at 506 (citation omitted). House Resolution 503 specifically tasks the Select Committee with "investigat[ing] and report[ing] upon the facts, circumstances, and causes … relating to the interference with the peaceful transfer of power." ECF 18-2 at 4; *see supra* at 4. Speaker Vos has direct information concerning President Trump's efforts to undermine the 2020 presidential election results. Although the recent calls to Speaker Vos reportedly took place after January 6th, their contents relate to efforts to undermine the peaceful transfer of power following the 2020 Presidential election.

Indeed, the details of Speaker Vos's various conversations with former President Trump about the 2020 election—and the reasons why Mr. Trump believes that an election could be reversed by a state legislature more than a year afterwards—are highly relevant to the work of the Select Committee. They will assist in understanding both the scope of the efforts to undermine the democratic process and the correlative need for corrective legislation. That should be the end of the matter because it conclusively establishes that the Select Committee's subpoena relates to a subject on which legislation could be had and, thus, is immune from challenge by virtue of the Speech or

Debate Clause.  *See Eastland*, 421 U.S. at 506.

In any event, to effectively propose legislation for Congress to consider, the Select Committee must gather information so that it can make informed decisions about the need for legislative action and the precise content of such proposed legislation.  Information-gathering lies at the very heart of the "sphere of legitimate legislative activity," *id.* at 503; *see also, e.g.*, *id.* at 504 ("The power to investigate … plainly falls within that definition [of legitimate legislative activity]."); *Biaggi*, 853 F.2d at 103; *United States v. Dowdy*, 479 F.2d 213, 224 (4th Cir. 1973), and is protected regardless of whether legislation is actually produced.  *Eastland*, 421 U.S. at 509 ("Nor is the legitimacy of a congressional inquiry to be defined by what it produces.  The very nature of the investigative function – like any research – is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result.").

Speaker Vos's contention that his conversations with former President Trump regarding attempts to overturn the results of the 2020 Presidential election is not a legitimate subject of inquiry, ECF 17 at 13, is manifestly wrong and provides no basis for evasion of the absolute immunity afforded by the Speech or Debate Clause.  Were such mere allegations sufficient to abrogate the absolute privilege afforded by the Clause, then, as the Court in *Eastland* observed, "the Clause simply would not provide the protection historically undergirding it."  421 U.S. at 509.

Accordingly, because the issuance of the subpoena was a legitimate legislative act, the Select Committee is absolutely immune from suit and the motion to quash must be dismissed.  As already noted, this Court need reach no other issues raised here.

### D.    Speaker Vos's Arguments To The Contrary Lack Merit

#### 1.    *Mazars* Is Not The Appropriate Framework

In an attempt to avoid the jurisdictional consequences of the Speech or Debate Clause,

Speaker Vos characterizes this case as one involving the structural separation of powers and argues that the Supreme Court's framework in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), applies. Speaker Vos's reliance on *Mazars* is misplaced.

*First*, the procedural posture of *Mazars* is inapposite. There, three Congressional Committees issued subpoenas to two banking institutions, as well as an accounting firm, seeking information about President Trump's personal finances. *Mazars*, 140 S. Ct. at 2027-28. President Trump, in his personal capacity, then filed two lawsuits against those institutions, seeking to prevent them from complying with the subpoenas. *See id.* at 2028. Because Mazars and the two banks took no position on the legal issues involved, the Committees intervened in the cases brought by President Trump to defend the validity of their subpoenas, thereby *voluntarily* subjecting themselves to the jurisdiction of the courts. *See id.*

*Second*, none of the Committees involved in *Mazars* asserted Speech or Debate immunity, the Supreme Court's opinion does not refer to the Speech or Debate Clause, and the reasoning of *Mazars* does not bear on whether a particular subpoena is legislative in nature or falls within the legitimate legislative sphere. In fact, other district courts have expressly held that *Mazars* "has no bearing" on the question of whether Congressional activity is protected by the Speech or Debate Clause. *See, e.g., Jud. Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 318, 319 n.7 (D.D.C. 2020); Mem. Op. at 9, *Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, No. 20-cv-106 (D.D.C. July 31, 2020), ECF 22 (rejecting any reliance on *Mazars* in a case involving Speech or Debate Clause immunity).

*Third*, Speaker Vos's apparent suggestion that this Court should apply "heightened scrutiny" here to vindicate interests of federalism is irrelevant where, for the reasons stated above, there is no subject matter jurisdiction. *See supra* at 8. Contrary to Speaker Vos's suggestion, the mere fact that he claims state legislative immunity over the testimony and information sought by the subpoena does not "nullify" the Select Committee's Speech or Debate immunity, ECF 17 at 15, nor does it

provide this Court with subject matter jurisdiction.

At bottom, Speaker Vos has improperly attempted to haul the Select Committee before this Court and obtain a judicial resolution of this dispute. Such action is precisely what the Speech or Debate Clause prohibits him from doing. *See supra* at 7-9.

### 2. In Addition To The Lack Of Subject Matter Jurisdiction, Judicial Restraint Cautions Against Entertaining Speaker Vos's Suit

While this may be the first case involving a Congressional subpoena issued to a sitting State legislator, it is not the first attempt by a government official to obtain a judicial ruling regarding compliance with a Congressional subpoena based on the assertion of privilege and the separation of powers. In 1983, the Administrator of the Environmental Protection Agency (EPA), Anne M. Gorsuch, sued the U.S. House of Representatives in federal court. *See United States v. U.S. House of Reps.*, 556 F. Supp. 150 (D.D.C. 1983). Administrator Gorsuch sought a declaratory judgment that she acted lawfully when responding to a Congressional subpoena she withheld certain EPA documents on the ground that they were assertedly protected by executive privilege. *See id.* at 151. There, as in this case, the district court was asked to "determine whether to resolve the constitutional controversy in the context of a civil action [.]" *Id.* at 152.

The district court declined the Executive Branch's invitation to adjudicate the dispute between the political branches, noting that "[c]ourts have a duty to avoid unnecessarily deciding constitutional issues." *Id.* (citing *United States v. Rumely*, 345 U.S. 41, 45-46 (1952)). Critically, the district court observed that the type of constitutional claims and other objections being argued could be raised by Administrator Gorsuch "as defenses [to] a criminal prosecution" should that occur. *Id.* at 152 (citing *Barenblatt v. United States*, 360 U.S. 109 (1959); then citing *Ansara v. Eastland*, 442 F.2d 751 (D.C. Cir. 1971); and then citing *United States v. Tobin*, 306 F.2d 270, 276 (D.C. Cir. 1962)). Thus, the district court concluded that "[j]udicial restraint is essential to maintain the delicate balance of powers among the branches established by the Constitution." *Id.*

The same result follows here. Like the district court in *United States v. U.S. House of Representatives*, this Court should decline to adjudicate Speaker Vos's claim. This case also implicates a constitutional conflict between different asserted authorities—albeit one sounding in federalism and between a State legislator and the federal Congress—for which "[j]udicial resolution ... will never become necessary unless [Speaker Vos] becomes a defendant in either a criminal contempt proceeding[,] or *other legal action [is] taken by Congress.*" *Id.* (emphasis added) (citing *Ansara v. Eastland*, 441 F.2d at 753-54).

In any event, any notion that Speaker Vos is immunized from a Congressional subpoena by some form of state legislator immunity that is binding on this Court and that overrides Speech or Debate Clause immunity is plainly wrong. As already discussed, the latter was created by the Framers of the U.S. Constitution and is expressly included in its text. And the Constitution also states unambiguously in the Supremacy Clause that "[t]his Constitution … shall be the supreme Law of the Land; … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. The plain language of the U.S. Constitution thus makes clear that no legal principle based on state law can govern here. *Cf. United States v. Locke*, 529 U.S. 89 (2000).

Speaker Vos fares no better if he is banking on a common law state legislator immunity doctrine, which "reflect[s] the [Supreme] Court's interpretation of federal law … and recognize[d] the need for immunity to protect the 'public good.'" *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 404-05 (1979). This would mean that Speaker Vos is relying on common law to override the express text of the Constitution, which would be to no avail. As Judge McFadden of the District Court for the District of Columbia recently held in a similar situation, "to the extent a common law right conflicts with an express provision in the Constitution, the common law is void … The Constitution trumps common law principles." Mem. Op. at 18-19, *Schilling v. Pelosi*, No. 22-

cv-162 (D.D.C. Oct. 3, 2022), ECF 19 (internal citations omitted).  In reaching this conclusion Judge McFadden relied on the Supremacy Clause, as well as on *Wheaton v. Peters*, which notes that federal courts "derive no jurisdiction from the common law; because the people of the United States, in framing their constitution, have thought proper to restrict them within certain limits."  33 U.S. (8 Pet.) 591, 628 (1834).

### 3. The Subpoena Serves A Valid Legislative Purpose And Does Not Violate The Separation Of Powers

Even if this Court had subject matter jurisdiction, all of Speaker Vos's claims fail on the merits.  The D.C. Circuit has held that "the January 6th Committee plainly has a valid legislative purpose and its inquiry concern[s] a subject on which legislation could be had."  *Trump v. Thompson*, 20 F.4th at 41 (internal quotation marks and citation omitted).  In so holding, the court described "Congress's uniquely vital interest in studying the January 6th attack on itself to formulate remedial legislation and to safeguard its constitutional and legislative operations."  *Id.* at 17.  Applying the D.C. Circuit's decision in *Thompson*, four other district courts have rejected arguments—nearly identical to Speaker Vos's arguments here—that the Select Committee lacks a legitimate legislative purpose.[13]

Nonetheless, Speaker Vos repeatedly insists that the Select Committee's subpoena is not "on matters within the bounds of the Committee's authorized investigation."  ECF 17 at 18-19.  He is wrong.

Under Article II of the U.S. Constitution, the Twelfth Amendment, and the Electoral Count Act of 1887, Presidential elections involve a detailed interplay between citizen voters, state and local

---

[13] *See, e.g.*, Order at 7-11, *Ward v. Thompson*, No. 22-cv-08015 (D. Ariz. Sept. 22, 2022), ECF 55; *Republican Nat'l Comm. v. Pelosi ("RNC")*, — F. Supp. 3d —, 2022 WL 1294509, at *16-19 (D.D.C. May 1, 2022), *appeal dismissed as moot and judgment vacated*, No. 22-5123 (D.C. Cir. Sept. 16, 2022); Oral Arg. Tr. at 34, *Budowich v. Pelosi*, No. 21-cv-3366 (D.D.C. Jan. 20, 2022), ECF 27; Order Den. Pl.'s Mot. for Prelim. Inj. at 10, *Eastman v. Thompson*, No. 22-cv-99 (C.D. Cal. Jan. 25, 2022), ECF 43.

government officials, and Congress. Congress is actively considering significant changes to the

Electoral Count Act, *see, e.g.*, H.R. 8873, 117th Cong. (2022) and S. 4573, 117th Cong. (2022), and

the Select Committee's insights have and will continue to inform that consideration. As the Select

Committee has explained in public hearings and other court filings, President Trump and his

associates engaged in a multi-part plan to undermine public confidence in the 2020 election results.

They repeatedly spread false information about the integrity of the 2020 Presidential election in the

lead-up to January 6th, and these efforts continue through the present day.[14] They pressured federal

officials to open meritless investigations and to make public statements strongly suggesting a lack of

confidence in the election results.[15] They took steps to pressure state and local officials to alter

those results and falsely declare Donald Trump the winner of the 2020 election.[16] Indeed, state

legislative officials became a centerpiece of these efforts, leading Mr. Trump and his surrogates to

target state officials and electoral college electors from multiple states.[17] Former President Trump

also personally pressured the Vice President to alter or delay the counting of electoral votes on

---

[14] *See, e.g.*, June 9, 2022 Select Comm. Hr'g, 117th Cong. (2022), https://perma.cc/P3GC-A88L (testimony of former Attorney General William Barr); June 21, 2022 Select Comm. Hr'g, 117th Cong. (2022), https://perma.cc/TJY4-U33U (testimony of former Georgia election worker, Wandrea ArShaye "Shaye" Moss); *see also* Cong. Defs.' Opp. to Pl.'s Privilege Assertions, *Eastman* (C.D. Cal. Mar. 3, 2022), ECF 164-1 (describing misrepresentations).

[15] *See, e.g.*, June 9, 2022 Select Comm. Hr'g, 117th Cong. (2022), https://perma.cc/P3GC-A88L (testimony of former Attorney General William Barr); June 23, 2022 Select Comm. Hr'g, 117th Cong. (2022), https://perma.cc/FPM7-AUEK (testimony of former Acting Attorney General, Jeffrey Rosen; former Acting Deputy Attorney General, Richard Donoghue; and former Assistant Attorney General for the Office of Legal Counsel, Steven Engel).

[16] *See, e.g.*, June 21, 2022, Select Comm. Hr'g, 117th Cong. (2022), https://perma.cc/TJY4-U33U (testimony of Arizona House Speaker, Rusty Bowers, and Georgia Secretary of State, Brad Raffensperger).

[17] *See* Cong. Defs.' Opp. to Pl.'s Privilege Assertions, *Eastman* (C.D. Cal. Mar. 3, 2022), ECF 164-1 (describing plan to use alternate electors from certain swing states to alter the results of the electoral college); June 21, 2022, Select Comm. Hr'g, 117th Cong. (2022), https://perma.cc/TJY4-U33U (staff presentation led by Casey Lucier).

January 6th.[18]

The Select Committee has also demonstrated how the forces that led to the violent attack on the Capitol continue to threaten American democracy today.[19] President Trump has made multiple statements since January 6th that shed light on his actions on and before that date and that continue his efforts to call the 2020 election into doubt. For example, in a January 2022 speech, former President Trump repeated the statement that former Vice President Pence "could have overturned the Election!"[20] On July 19, 2022, former President Trump posted an article on Truth Social, describing it as "a must-read for all of those that PRETEND there was no Fraud in the 2020 Presidential Election."[21] Likewise, on August 29, 2022, Trump "called to be reinstated as president or for a 'new election, immediately.'"[22] And just last week, he repeated numerous disproven allegations of election fraud in speeches in Arizona and Nevada.[23]

---

[18] *See, e.g.*, June 16, 2022 Select Comm. Hr'g, 117th Cong. (2022), https://perma.cc/GKY6-7N82 (testimony of former Counsel to Vice President Mike Pence, Marc Short); *see also* Cong. Defs.' Opp. to Pl.'s Privilege Assertions, *Eastman* (C.D. Cal. Mar. 3, 2022), ECF 164-1 (describing efforts to persuade the Vice President to alter or delay the count on January 6, 2021).

[19] *See, e.g.*, June 21, 2022 Select Comm. Hr'g, 117th Cong. (2022), https://perma.cc/TJY4-U33U (Chairman Thompson's opening statement regarding ongoing threats to democracy).

[20] Statement by Donald J. Trump, 45th President of the United States of America, Jan. 30, 2022, https://perma.cc/Q6WM-F77U (archived) ("If the Vice President (Mike Pence) had 'absolutely no right' to change the Presidential Election results in the Senate, despite fraud and many other irregularities, how come the Democrats and RINO Republicans, like Wacky Susan Collins, are desperately trying to pass legislation that will not allow the Vice President to change the results of the election? Actually, what they are saying, is that Mike Pence did have the right to change the outcome, and they now want to take that right away. *Unfortunately, he didn't exercise that power, he could have overturned the Election!*" (emphasis added)).

[21] Donald J. Trump, Truth Social (July 19, 2022, 10:01 p.m.), https://perma.cc/W6Z7-JGJ8.

[22] Ted Johnson, *Donald Trump Goes on Social Media Tear with Conspiracy Theories, False Election Claims Amid Mar-a-Lago Document Investigation*, The Deadline (Aug. 30, 2022), https://perma.cc/N3KW-8R94.

[23] *Trump in Arizona: Former president ends speech saying U.S. is 'nation in decline,'* Azcentral. (Oct. 10, 2022), https://perma.cc/HQ4B-2DBJ; Sean Golonka & Carly Sauvageau, *Trump decries Nevada gas prices, boosts Laxalt, Lombardo and GOP ticket*, Nev. Indep. (Oct. 8, 2022), https://perma.cc/H4HG-YFYG.

These continuing efforts to undermine the 2020 Presidential election results and the peaceful transfer of power are more than sufficient to justify the Select Committee's interest in Speaker Vos's testimony and to establish a valid legislative purpose for the subpoena issued to him. Mr. Trump has stated his current desire to be reinstated as President.[24]

### 4. The Select Committee Is Properly Composed

Speaker Vos next contends that the "Committee is not properly composed, and the Subpoena was not properly issued due to a material failure of Congress and the Committee to follow its own rules." ECF 17 at 20. He further alleges that the Select Committee "was not formed using Minority-proposed [M]embers and a Ranking Member as required by its authorizing resolution[.]" *Id.* Those arguments are fatally flawed for multiple reasons.

As an initial matter, any demand that this Court override the actions of the House and its Speaker for assertedly not following the Select Committee's authorizing resolution asks this Court to violate both the text of the Constitution and Constitutional separation of powers principles. The Constitution's Rulemaking Clause states that "[e]ach House may determine the Rules of its Proceedings." U.S. Const., Art. I, § 5, cl. 2. The D.C. Circuit, which has extensive case law in this area, has held that the Rulemaking Clause "'clearly reserves to each House of the Congress the authority to make its own rules,' and ... interpreting a congressional rule 'differently than would the Congress itself' is tantamount to '*making* the Rules—a power that the Rulemaking Clause reserves to each House alone.'" *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)); *see also Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013). As the D.C. Circuit has explained, it is a "startlingly unattractive idea, given

---

[24] Donald J. Trump, Truth Social (Aug. 29, 2022, 8:39 a.m.), https://perma.cc/9ZXL-4C9D; Ted Johnson, Donald Trump Goes on Social Media Tear with Conspiracy Theories, False Election Claims Amid Mar-a-Lago Document Investigation, The Deadline (Aug. 30, 2022), https://perma.cc/N3KW-8R94.

[courts'] respect for a coequal branch of government, for [a federal court] to tell the Speaker" whom to appoint to committees. *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1176 (D.C. Cir. 1982) (internal quotation marks omitted).

In addition, Speaker Vos's arguments ignore the presumption of regularity due Congress. *See Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity ... cannot be denied to the proceedings of the houses of Congress, when acting upon matters within their constitutional authority."). None of Speaker Vos's allegations comes close to demonstrating the "clear evidence to the contrary," *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926), required to overcome that presumption.

Regardless, Speaker Vos's challenges to the Select Committee's composition are each deeply flawed.

By way of background, the House has four different kinds of committees, each of which is established and governed by various House Rules, statutes, and House resolutions, or on an *ad hoc* basis. *See, e.g.*, Rule X, Rules of the U.S. House of Representatives, 117th Cong. (2021)[25] ("House Rules") (rules governing "standing" Committees); 26 U.S.C. §§ 8001-05 (establishing the Joint Committee on Taxation); H. Res. 503 § 1 (establishing the Select Committee); 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) (appointment of conferees for H.J. Res. 31). The House Rules and procedures governing appointments to these four distinct types of committees vary.

*First*, Speaker Vos complains that Speaker Pelosi has appointed only nine Members to the Select Committee, rather than the thirteen House Resolution 503 allows. ECF 17 at 21; H. Res. 503 § 2(a) ("The Speaker shall appoint 13 Members[.]"). But the Resolution does not require that *all* thirteen Members be appointed at once for the Select Committee to function, nor does the

---

[25] *Available at* https://perma.cc/MD75-JHUU.

authorization to appoint thirteen Members require the appointment of that precise number.

Indeed, there is House precedent for such a select committee having fewer than its full allotment of Members. In the 109th Congress, for instance, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty Members, using similar language. *See* H. Res. 437, 109th Cong. § 2(a) (2005) ("The select committee shall be composed of 20 members appointed by the Speaker[.]"). House Speaker Dennis Hastert appointed only eleven Members, all of whom were from the Republican majority party. *See* H. Rep. No. 109-377, at ii (2006) (listing Members appointed by Speaker Hastert). In fact, House Resolution 503 even contemplates the possibility of "vacancies" but does not provide a specific timeline for filling them. H. Res. 503 § 2(c). Nor does House Resolution 503 provide that the Select Committee becomes invalid or that it must suspend all action when vacancies arise. *Id.*

*Second*, Speaker Vos complains that Speaker Pelosi "refused to consult with the Minority" and "appointed all nine [M]embers on her own without input from the Minority Leader." ECF 17 at 21. But the power to appoint House Members to select Committees rests exclusively with the Speaker of the House. *See* House Rule I.11, ("The Speaker shall appoint all select, joint, and conference committees ordered by the House."). And, by unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House." 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (authorizing Speaker to "accept resignations and to make appointments authorized by law or by the House"); *see also* 8 *Cannon's Precedents of the U.S. House of Representatives* § 2172 (1936) (citing "[i]nstances in which the majority declined to recognize minority recommendations for committee assignments").

House Resolution 503 is consistent with that practice. When creating the Select Committee, the House required that five Members be chosen "after *consultation* with the [M]inority [L]eader." H. Res. 503 § 2(a) (emphasis added). This language provides the Speaker greater authority regarding the

appointment of minority party Members than, for example, either language authorizing the Minority Leader to directly appoint a certain number of Members, or language requiring that appointments be made "upon the recommendation of the Minority Leader." *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) ("Consultation" means to "seek[] advice or information of.") (internal quotation marks omitted); *Consultation*, Black's Law Dictionary (11th ed. 2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone"). The Minority Leader's refusal to consult further after the Speaker declined to appoint two of his recommendations does not alter the Speaker's authority under House Resolution 503. Neither the Speaker nor the full House have interpreted House Resolution 503 to allow the Minority Leader to unilaterally frustrate the operation of the Select Committee. Indeed, no reasonable interpretation of House Resolution 503 would so allow.

Had the House intended a binding role for the Minority Leader, it could have provided for such a requirement, as it has in the past. *See* H. Res. 6, 116th Cong. § 104(f)(1)(B) (2019) (Select Committee on the Climate Crisis requirement that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader"); *id.* § 201(b)(3) (same requirement for Select Committee on the Modernization of Congress). Similarly, had the House wished to delegate appointment power directly to the Minority Leader, it could have done so. *See, e.g.*, H. Res. 24, 110th Cong. § 2(a) (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

Here, House Resolution 503 was followed: the Minority Leader *was* consulted.[26] The fact

---

[26] In *Eastman v. Thompson*, the court described Speaker Pelosi's consultations with Minority Leader McCarthy: "The Speaker of the House 'spoke[]' with the Minority Leader regarding his recommended five Members and conveyed her objections to two candidates and intention to appoint the remaining three. The Minority Leader declined to recommend two other Republicans and instead withdrew all five recommendations." *Eastman v. Thompson*, No. 22-cv-00099, 2022 WL 1407965, at *3 (C.D. Cal. Jan. 25, 2022) (alteration in original). Following the Minority Leader's

that the Speaker—using the authority provided to her by the House Rules; the January 4, 2021,

Order of the House; and House Resolution 503—made different selections as to two Members, and

that the Minority Leader subsequently withdrew his recommendations, does not make the Select

Committee improperly constituted, nor does it invalidate any of its actions.

*Third*, Speaker Vos complains that the subpoena is invalid because "[t]here is no Ranking

Member," ECF 17 at 21, and, therefore, Chairman Thompson failed to make the requisite

consultation before issuing the subpoena that compelled Speaker Vos to appear for a deposition.

*See id.* That argument, too, is wrong.

To the extent House Resolution 503 requires consultation with the "ranking minority

member" prior to the issuance of a deposition subpoena, that requirement was satisfied by

consultation with Vice Chair Liz Cheney. Representative Cheney, by virtue of being the first

minority party Member appointment to the Select Committee, is, by definition, the senior ranking

minority Member of the Select Committee. Consistent with House practice and precedent, the term

"ranking member" means the first Member of the minority party appointed to the Select Committee

by the Speaker. *See, e.g.*, H. Res. 10, 117th Cong. (2021) (containing ranking minority member

appointments to the standing Committees of the House, colloquially referred to as "ranking

members"). That interpretation should not be subject to judicial review. Here, the senior minority

Member on the Select Committee (the first minority Member appointed) is Vice Chair Liz Cheney.

That is sufficient for purposes of House Resolution 503, as ratified by the full House of

Representatives. *See infra* at 26, n.28. The Rulemaking Clause of the Constitution requires that the

---

failure to continue the consultation process, the Speaker interpreted and applied House Resolution
503 and House Rules consistent with House precedents. As indicated, the Constitution's
Rulemaking Clause leaves no doubt that judicial deference to this application of Resolution 503 is
required. *See also* Defs.' Mot. for Summ. J. at 7-8, 17-25, *Meadows v. Pelosi*, No. 21-cv-03217 (D.D.C.
Apr. 22, 2022), ECF 15.

judiciary defer to the House regarding the interpretation and application of the House's own rules and procedures.

*Fourth*, every district court to have considered similar challenges to the Select Committee's composition has rejected them. As Judge Kelly of the District Court for the District of Columbia explained, if he accepted the plaintiff's arguments about the Select Committee's composition, he "would be 'interpret[ing] the Rule differently than … the [House] itself' and 'would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.'" *RNC*, 2022 WL 1294509, at *15 (alterations in original) (quoting *Rostenkowski*, 59 F.3d at 1306-07). Judge Kelly emphasized that "the House views the Select Committee to be duly constituted and empowered to act under its authorizing resolution." *Id.* (Indeed, "[t]his understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas." *Id.*

For example, when the full House debated the resolutions recommending referral of Stephen Bannon, Mark Meadows, Peter Navarro, and Daniel Scavino, Jr. for contempt of Congress for failure to comply with Select Committee subpoenas, several Members of Congress raised arguments about the composition and authority of the Select Committee.[27] The full House

---

[27] *See, e.g.*, 167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) (statement of Rep. Biggs) ("This committee is illegitimate. It has violated its own rules of creation. It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6. You can't have a committee to find out what happened because you are interested. You can't do that. And that is what they are doing today."); *id.* at H7786 (statement of Rep. Banks) (contending that the Select Committee does not comply with H. Res. 503 because "the committee has zero members appointed in consultation with Leader McCarthy" and "it doesn't have 13 members"); *see also* 168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) (statement of Rep. Reschenthaler) (specifically raising challenges to the Select Committee's means of operation before the full House during its debate over whether the House should adopt a contempt resolution relating to Peter Navarro and Daniel Scavino, Jr.); 167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) (statement of Rep. Banks) (arguing, in debate on the contempt resolution for Steve Bannon, that "the subpoenas that have so far been issued do not ask for information that would meet any legitimate legislative purpose").

nonetheless approved the Select Committee's referrals of those four individuals for contempt of Congress.[28] The full House's ratification of the referrals reinforces that any objection by Speaker Vos to the Select Committee's composition cannot be accepted.

In addition to Judge Kelly in *RNC*, four other district courts have rejected substantially similar challenges to the composition of the Select Committee. In *Budowich v. Pelosi*, Judge Boasberg, also of the District Court for the District of Columbia, held that courts must "defer to Congress in the manner of interpreting its rules," and that it would be "usurping Congressional authority" to hold that the Select Committee was not validly composed. Oral Arg. Tr. at 34:4-10, *Budowich*, No. 21-cv-03366 (D.D.C. Jan. 20, 2022), ECF 27. Shortly thereafter, Judge Carter of the Central District of California agreed with Judge Boasberg, likewise recognizing the deference owed to the Speaker, the full House, and the Select Committee in interpreting a House resolution. As Judge Carter explained, "[a] court may interpret internal congressional rules only when such interpretation 'requires no resolution of ambiguities.'" *Eastman v. Thompson*, No. 22-cv-00099, 2022 WL 1407965, at *6 & n.12 (C.D. Cal. Jan. 25, 2022) (quoting *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995)). And in denying Mr. Bannon's motion to dismiss his indictment for contempt of Congress, Judge Nichols of the District Court for the District of Columbia rejected Bannon's challenge to the composition of the Select Committee. Like his colleagues, Judge Nichols recognized that he "must give great weight to the interpretation of those House members charged with implementing the [authorizing] resolution and to the House itself," and "there would be potential separation of powers issues, should this or any court reject a congressional interpretation

---

[28] *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows); H. Res. 1037, 117th Cong. (2022) (Navarro and Scavino). These resolutions were reported by the Select Committee, approved for floor consideration by the House Rules Committee, and approved by the full House. *See* 167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) (vote on Bannon); 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (vote on Meadows); 168 Cong. Rec. H4379 (daily ed. Apr. 6, 2022) (vote on Navarro and Scavino).

of its own rule." Oral Arg. Tr. at 115:7-24, *United States v. Bannon*, No. 21-cr-00670 (D.D.C. June 15, 2022). Most recently, Judge Humetewa of the District Court for the District of Arizona "reject[ed] Plaintiffs' argument that the subpoena was unauthorized because it was issued by nine members of the Select Committee and will defer to the House's 'construction of its own rules.'" Order at 11-12, *Ward v. Thompson*, No. 22-cv-08015 (D. Ariz. Sept. 22, 2022), ECF 55 (quoting *United States v. Smith*, 286 U.S. 6, 33 (1932)).

In short, there is no basis for this Court to substitute an alternative interpretation of the Select Committee's authorizing resolution for the House's view; indeed, such a determination would be impermissible as "tantamount to 'making the [House] Rules.'" *Barker*, 921 F.3d at 1130; *see also* Oral Arg. Tr. at 33-34, *Budowich* (D.D.C. Jan. 20, 2022), ECF 27; *Eastman*, 2022 WL 1407965, at *6 & n.12; *Vander Jagt*, 699 F.2d at 1175.

Turning to the specific House deposition regulations that Speaker Vos cites, his arguments fare no better. All of his complaints turn on the Select Committee being composed in violation of the House's rules. As discussed above, *see supra* at 20-25, those arguments are incorrect, so Speaker Vos's complaints about the specific regulations are also flawed. Specifically, regarding Regulation 2, *see* ECF 17 at 22, the plain language of that regulation governs notice of depositions to the Members of the Select Committee; it says nothing about the notice required to the subpoena recipient/witness. In fact, nothing in the House Rules governing subpoenas provides that any specific period of notice be provided to a subpoena recipient. *See* House Rule XI.2(m). Thus, Speaker Vos has no standing or basis to complain about notice the Select Committee Members may or may not have received. Regardless, the Select Committee postponed Speaker Vos's deposition, and thus any concerns about the amount of notice provided as a result of the original deposition date are now moot.

Speaker Vos's complaints regarding "Regulations 5 and 6" turn on his argument that there is

no Ranking Member. ECF 17 at 22. As discussed above, Speaker Vos is wrong. *See supra* at 24-25. Moreover, it is not uncommon for Committee depositions to be structured in the most efficient and effective manner possible. This includes instances where a Committee's Minority may forgo the ability to separately question witnesses, and/or may cede time in their round of questioning to the Majority. This frequently occurs when the interests regarding a particular investigation or questioning of a witness are aligned, as is the case here. The fact that the Select Committee is operating in a bipartisan, cooperative manner, where the Members from both political parties have agreed on process, does not violate the deposition regulations.

Speaker Vos's argument regarding Regulation 7, that witnesses are subject to contempt findings without any meaningful input, ECF 17 at 22, is entirely speculative and lacks merit. To date, the only witnesses who have faced contempt proceedings are those that have either chosen not to engage with the Select Committee in any substantive way (Bannon, Scavino, and Navarro), or who have asserted privileges and immunities that have no basis in law (Meadows).

Finally, with respect to Regulation 10, Speaker Vos's argument is misguided. ECF 17 at 23. First, there is a Ranking Member, *see supra* at 24-25. Second, this argument ignores both the presumption of regularity afforded Members of Congress, *see supra* at 21, as well as the D.C. Circuit's admonition that courts are "compelled to rely on the assumption that Congressional committees will act responsibly with confidential data revealed to them." *Exxon Corp. v. F.T.C.*, 589 F.2d 582, 591 (D.C. Cir. 1978). In other words, there is no reason to think—and Speaker Vos provides none—that if there is privileged information provided to the Select Committee, it will automatically be publicly disclosed.

In sum, the Select Committee's investigation and its subpoena to Speaker Vos are undoubtedly authorized by House Resolution 503, and he provides no basis for this Court to conclude otherwise.

## III. SPEAKER VOS HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF IRREPARABLE HARM

The Court should deny Speaker Vos's Motion for a Preliminary Injunction for the independent reason that he has not established a likelihood of irreparable injury. A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Because a preliminary injunction is an "extraordinary remedy," a mere "possibility" of irreparable injury is not sufficient. *Id.* The Seventh Circuit has made clear that "a plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries." *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705-06 (7th Cir. 2005).

Speaker Vos makes no attempt to meet his burden. At best, he includes the conclusory statement that "fundamental rights have already been violated," ECF 17 at 24, but only speculates about what might happen at some future deposition and points to the same flawed arguments regarding the composition of the Select Committee. That showing is insufficient to justify the extraordinary remedy of a preliminary injunction against the Select Committee.

## IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF THE SELECT COMMITTEE

The balance of the equities and the public interest strongly support denial of the requested injunction. When weighing equities, here, because the Select Committee is the Government, its harm "coincides with the public interest." *Tranchita v. Callahan*, 511 F. Supp. 3d 850, 853 (N.D. Ill. 2021) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("[T]he government's interest *is* the public interest.")). Moreover, the D.C. Circuit has recognized a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress." *Exxon Corp.*, 589 F.2d at 594. And the information is sought here pursuant to "Congress's discharge of its primary constitutional responsibilities." *Comm. on the Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 764 (D.C. Cir. 2020) (en banc).

29

As explained above, Speaker Vos has not shown that he would suffer any meaningful harm in the absence of a preliminary injunction. By contrast, the Select Committee's interests in prompt compliance with the subpoena are of the highest order. *See Barenblatt*, 360 U.S. at 111; *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927) ("[W]here the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it."). The Select Committee is investigating matters of immense national importance. And the details of Speaker Vos's communications with Mr. Trump are currently unknown and important to that investigation. The Select Committee's interest in promptly proceeding with its investigation is self-evident, and injunctive relief would hinder and frustrate that ongoing investigation.

It is difficult to imagine a Congressional investigation of greater national and constitutional significance. The public interest in permitting the Select Committee to proceed with its investigation thus compels rejection of Speaker Vos's Motion.

## CONCLUSION

For the reasons set forth above, Speaker Vos's Motion for a Preliminary Injunction should be denied and the Complaint should be dismissed in its entirety with prejudice.

Respectfully submitted,

/s/ *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

Dated: October 11, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2022, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the Eastern District of Wisconsin, which I understand caused a copy to be served on all registered parties.

*/s/ Douglas N. Letter*
Douglas N. Letter